**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff–Appellant,**

v.

**The CHICAGO CLUB, Defendant–Appellee.**

No. 95–2323.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1996.

Decided June 6, 1996.

Paula R. Bruner (argued), Equal Employment Opportunity Commission, Washington, DC, Pamela S. Moore–Gibbs, Equal Employment Opportunity Commission, Chicago, IL, for Plaintiff–Appellant.

Jeffrey S. Fowler, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, Michael F. Rosenblum (argued), Jeri A. Lindahl–Garcia, Mayer, Brown & Platt, Chicago, IL, for Defendant–Appellee.

Before COFFEY, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The Equal Employment Opportunity Commission ("EEOC") is apparently dissatisfied with the provision of federal law that places truly private clubs outside its regulatory reach. EEOC seeks to remove this congressionally enacted impediment by interpreting the bona fide private club exemption of 42 U.S.C. § 2000e(b) out of existence. Toward that end, EEOC asks us to declare that one of Chicago's well-known private clubs—the Chicago Club—is not really private. The Chicago Club is not sufficiently selective in its membership to qualify as private, asserts EEOC, because some of its newly admitted members are merely "commodity brokers, lawyers and younger mid-level corporate executives." Moreover, claims EEOC, the Chicago Club permits its members excessively

free rein in entertaining guests. The Chicago Club, not surprisingly, maintains that it is indeed a bona fide private membership club and is thus excluded from the coverage of Title VII.

The simple fact is that if we were to endorse EEOC's eviscerating interpretation of § 2000e(b), no organization in the United States could meet the statutory definition of bona fide private membership club. For the reasons discussed below, we confirm what everyone familiar with this litigation already knows—or should know: the Chicago Club does indeed qualify as a bona fide private membership club under § 2000e(b). We accordingly affirm the judgment of the district court.

## I. BACKGROUND

### A. Undisputed facts regarding the Chicago Club

The Chicago Club ("the Club") came to life in early 1869. The clubhouse is presently located on the corner of Michigan Avenue and East Van Buren Street in downtown Chicago.

Ownership of the Club is vested in the membership, and the members elect eleven of their own to a board of governors for a nominal term of four years. The board of governors oversees all facets of the Club's operations and appoints a general manager who reports directly to the board. The Club's bylaws authorize a total of 1,450 resident and nonresident members, excluding seniors. At the time EEOC filed this lawsuit, the Club had 1,247 members. There are twelve classes of Club membership, which include several subclasses of resident and nonresident memberships and special classifications for federal or foreign government employees and for surviving spouses of deceased members. The Club annually bestows one membership for distinguished service upon a person who has attained unique recognition for public service or for other accomplishments.

The board of directors extends invitations to membership under one of two provisions in the Club's bylaws. Under one provision, one member proposes a candidate and two members second the proposal. Two directors must be acquainted with candidates for resident membership, and one director must be acquainted with nonresident candidates. The names of the candidates are published to the Club, and members may comment upon the candidates. The Club's secret membership commission reviews the proposed candidates and the membership's comments and makes recommendations to the board. The board may then extend invitations to membership. Another provision of the bylaws allows the board of governors, upon its own motion and without any formal procedure, to elect a person to any class of membership in which there is a vacancy. In no case under either procedure may an invitation to membership issue if two or more directors present for the vote are opposed.

This procedural gauntlet incorporates a screening process that emphasizes personal interaction between members and candidates for membership. This interaction, in turn, furthers the continuity of membership qualifications by ensuring that proposers, seconders, and directors possess a degree of familiarity with candidates. In addition to the screening incident to the admission procedures, the bylaws require that candidates be "of good standing" and at least twenty-five years of age. While the Club disclaims any rigid indicia by which it selects members, "good standing" seems to require sound moral character in the eyes of the Club and personal or professional distinction. Qualified candidates are admitted to membership without regard to race, sex, national origin, or religious affiliation.

The Club's membership is populated by a narrow band of the sociological spectrum. The Club provided the following breakdown of 481 members admitted in the ten years preceding December 31, 1992: 65 chairmen of corporations; 62 chief executive officers, chief financial officers, or chief operating officers; 101 corporate presidents; 101 corporate vice-presidents; 96 partners or principals in major accounting, investment, or law firms; 31 corporate directors; 5 college deans; 3 attorneys; and 2 local branch managers of national financial institutions. The remaining fifteen members identified them-

selves as engaged in a variety of professional and philanthropic endeavors. There is evidence that since 1993 the Club has made a conscious effort to increase its membership roll, in part to boost revenue.

The Club maintains athletic, dining, and lodging facilities in addition to a barbershop, lounge, library, and executive suites. Members avail themselves of these facilities and may host events such as meetings, banquets, or receptions in any of the Club's several private function rooms. The Club allows nonmember guests the use of its facilities under certain conditions and under the sponsorship of a member. Members may arrange for guests to be issued a guest card that affords them the use of Club facilities for as many as fourteen days. Card-carrying guests may use the Club under this arrangement without the presence of the sponsoring member, but guest-card privileges are not coextensive with membership privileges. Guest card holders may bring other nonmembers to the Club with them, but they are not permitted to request guest cards or the attendant privileges for nonmembers. Spouses of members may bring nonmember guests to the Club and may exercise signing privileges, but they, too, are not permitted to request guest cards for nonmembers.

The Club allows its members to host functions for organizations or individual nonmembers provided the hosting member is present at the function. The record details several occasions at which members hosted private and civic functions at the Club. Members are financially responsible for these functions, but third-party nonmembers sometimes remit payment directly to the Club or reimburse the hosting member. There is evidence of two instances in which nonmembers hosted functions at the Club: Frank Stover, the Club's resident general manager, hosted a gathering of Roosevelt University students in September 1992; and the Club allowed a Swedish culinary team to use its kitchens in preparation for the May 1991 National Restaurant Association competition.

## B. Procedural history

EEOC filed this lawsuit in the Northern District of Illinois pursuant to 42 U.S.C. § 2000e–5(f)(3) on October 15, 1992. It alleged that the Club was required to comply with the Title VII reporting requirements codified at 42 U.S.C. § 2000e–8(c) and sought declaratory and injunctive relief. The Club answered that it was not an "employer" under the definition provided at 42 U.S.C. § 2000e(b), and this issue became the focal point of the controversy. EEOC filed a motion for summary judgment, and the Club responded with a cross-motion for summary judgment.

The district court referred both parties' motions to a magistrate judge for the preparation of proposed findings of fact and a recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge issued a report and recommendation, in which she found that there existed no genuine issue of material fact and that the Club qualified as a bona fide private membership club under § 2000e(b). Both parties filed objections to the report and recommendation. The parties agreed that there was no issue of material fact but took predictable exceptions to certain of the magistrate judge's legal conclusions. EEOC objected to her finding that the Club was not covered by the § 2000e(b) definition of employer, and the Club disagreed with her holding that it bore the burden of proving that it qualified under the private club exemption.

The district court reviewed the disputed portions of the magistrate judge's report and recommendation *de novo* under 28 U.S.C. § 636(b)(1) and FED.R.CIV.P. 72(b). It issued a decision on March 31, 1995, in which it discussed and overruled both parties' objections and granted summary judgment in favor of the Club. The court entered final judgment on April 5, and EEOC appealed.

## C. Our standard of review

The parties agree that the material facts are not in dispute, but their opinions diverge on the inferences and conclusions the district court drew from those facts. Their disagreement focuses upon the district court's application of its interpretation of the private club exemption of § 2000e(b) in ruling on the cross-motions for summary judgment. EEOC offers several reasons why the

district court erred in its application of § 2000e(b). Although the parties traded motions for summary judgment, this appeal comes from a grant of summary judgment in favor of the Club. We therefore treat EEOC as the nonmoving party. Our standard of review on a grant of summary judgment is *de novo*. *Tolentino v. Friedman*, 46 F.3d 645, 649 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995).

## II. BURDEN OF PROOF UNDER SEC. 2000e(b)—JURISDICTION—STANDING

■ The Club reiterates an argument that it raised as an objection to the magistrate judge's report and recommendation, namely that the EEOC bears the burden of proving—as a jurisdictional matter—that the Club does not fit in the private club enclave of § 2000e(b). Absent such proof, argues the Club, the article III courts have no subject matter jurisdiction over this controversy. It is the duty of this court to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934).

### A. Federal question jurisdiction

■ The jurisdictional argument is a syllogism. The article III courts have federal question jurisdiction over cases or controversies "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (implementing the subject matter jurisdiction authorized by U.S. CONST. art. III, § 2).[1] Title VII applies to, among others, employers within the definition of § 2000e(b). If the Club is not an employer under § 2000e(b), then it owes no fidelity to Title VII. Because no case or controversy involving the Club can arise under Title VII, the article III courts lack federal question jurisdiction.

■ The Club's syllogism is elegantly simple, but it proves unacceptable consequences.

It suggests that a plaintiff must prove, as a matter of jurisdiction under § 1331, that the defendant is in fact bound by the federal law asserted as a basis for the requested relief. This construction of § 1331 conflates the "arising under" and "civil action" prerequisites into a rule that would divest a district court of jurisdiction if a plaintiff were unsuccessful in proving its case. It also conflicts with the principle that parties may not consent to subject matter jurisdiction, *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556–57, 42 L.Ed.2d 532 (1975), a corollary to the rule that subject matter jurisdiction cannot be waived. *Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). The Club could have admitted to being an employer under § 2000e(b), and it would have been bound by that admission. A party may not be estopped, however, from contesting subject matter jurisdiction. *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17–18, 71 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951).

■ The present case clearly turns upon the construction and effect of § 2000e(b) and is well within the statutory grant of federal question jurisdiction. *See Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936); *Shoshone Mining Co. v. Rutter*, 177 U.S. 505, 509–10, 20 S.Ct. 726, 727–28, 44 L.Ed. 864 (1900). A party's claim for relief under federal law does not pass muster under § 1331 if it is "so attenuated and unsubstantial as to be absolutely devoid of merit." *Hagans v. Lavine*, 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974) (quoting *Newburyport Water Co. v. Newburyport*, 193 U.S. 561, 579, 24 S.Ct. 553, 557, 48 L.Ed. 795 (1904)); *see also Bailey v. Patterson*, 369 U.S. 31, 33, 82 S.Ct. 549, 550–51, 7 L.Ed.2d 512 (1962). A claim is devoid of merit if "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." *Id.*

---

1. It is important to keep in mind that despite the similar language contained in article III and 28 U.S.C. § 1331, the latter's jurisdictional purview is considered smaller than the former's in cases arising under federal statutes. *See Verlinden B.V.*

*v. Central Bank of Nigeria*, 461 U.S. 480, 492, 103 S.Ct. 1962, 1972, 76 L.Ed.2d 81 (1983). Also note that we use "federal question" and "subject matter" interchangeably; § 1331 uses the term "federal question."

(quoting *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933)). Even in cases involving such "obviously frivolous" claims, *Hannis Distilling Co. v. Baltimore,* 216 U.S. 285, 288, 30 S.Ct. 326, 327, 54 L.Ed. 482 (1910), it is not clear that dismissal on this ground is jurisdictional. *See Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

One might conclude from our analysis of EEOC's argument that it belongs to the class of cases envisioned by the *Levering* Court, but such a deduction would be incorrect. This appeal represents the first occasion for this circuit to address both the question of the private club exemption of § 2000e(b) and the contextual relevance of the associational liberty framework historically applied in cases involving Title II. There was, prior to our decision today, a vacuum in which the inferences and interpretations proposed by EEOC might be thought plausible. Our rejection of those inferences and interpretations in plenary review of the district court's decision holds no ramification for the district court's exercise of subject matter jurisdiction under 28 U.S.C. § 1331. *Cf. Bell,* 327 U.S. at 682–83, 66 S.Ct. at 776 (questioning the accuracy of characterizing a dismissal for failure to allege a plausible cause of action arising under federal law as jurisdictional). The claim asserted by EEOC for declaratory and injunctive relief was not based upon a patently unreasonable construction of federal law.

**B. Burden of proof of employer status under § 2000e(b)**

The Club's argument lies with the district court's allocation of burdens of proof. The Club argues that EEOC should bear the burden of proving that it is an employer under the entire definition of § 2000e(b), not just insofar as it employs fifteen or more persons and conducts business in interstate commerce. We find much to commend in the Club's argument.

It is a commonly accepted canon that "[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception." *Mills Music, Inc. v. Snyder,* 469 U.S. 153, 188 n. 20, 105 S.Ct. 638, 657 n. 20, 83 L.Ed.2d 556 (1985) (White, J., dissenting) (quoting 2A C. SANDS, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.11, at 145 (4th ed. 1984)). The courts of appeals have applied this rule in cases where defendants have invoked the private club exceptions from federal civil rights and fair housing laws. *See United States v. Columbus Country Club,* 915 F.2d 877, 881–82 (3d Cir. 1990) (defendant has burden to show it is a private or religious club excepted from Title VIII fair housing laws), *cert. denied,* 501 U.S. 1205, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991); *United States v. Lansdowne Swim Club,* 894 F.2d 83, 85 (3d Cir.1990) (defendant must prove it is a private club excepted from Title II); *Singleton v. Gendason,* 545 F.2d 1224, 1226 (9th Cir.1976) (defendant must demonstrate it is excepted from Title VIII as a single-family dwelling); *Nesmith v. Young Men's Christian Ass'n,* 397 F.2d 96, 101 (4th Cir.1968) (defendant must prove its status as a private club under Title II). The Fifth Circuit applied this rule in *Quijano v. University Federal Credit Union,* 617 F.2d 129, 132 (5th Cir.1980), where it held that a defendant bears the burden of proving its exemption from Title VII as a bona fide private membership club. EEOC characterizes *Quijano* as the seminal case on the private club exemption under Title VII.

We have examined the pedigree of the case law relied upon by the *Quijano* court in its allocation of the burden of proof. The *Quijano* court cites for support to *Nesmith,* 397 F.2d at 101, a case which, as noted above, deals with Title II. It is not as clear to us as it appears to have been to the *Quijano* court, the district court in *EEOC v. University Club of Chicago,* 763 F.Supp. 985, 988 (N.D.Ill.1991) (relying on *Quijano* in assigning burden of proof to defendant in Title VII action), or the district court in this case how appropriate is the analogy between the statutory exception contained in Title II and the exclusion of private clubs from the definition of employer contained in Title VII. The root of our doubt lies in the important distinction between an exception to the prohibition of a statute and an exclusion from the definition of entities covered by a statute.

Our research reveals that the lineage of Supreme Court case law applying the burden of proof to those seeking the benefit of exceptions to statutes has its modern origins in two cases decided in the nineteenth century. In *Ryan v. Carter*, 93 U.S. (3 Otto.) 78, 23 L.Ed. 807 (1876), and *United States v. Dickson*, 40 U.S. (15 Pet.) 141, 165, 10 L.Ed. 689 (1841), the Court considered the effect of provisos that carved exceptions from statutory regimes. *Ryan* involved a law designed to settle conflicting claims to real property on land acquired from France in the Louisiana Purchase of 1803, and this law contained a proviso excepting claims that had been confirmed by a board of commissioners. The Court stated:

> The general rule of law is, that a proviso carves special exceptions only out of the body of the Act; and those who set up any such exception must establish it, as being within the words as well as the reasons thereof.

93 U.S. (3 Otto.) at 83. This excerpt from *Ryan* is an exact duplication of language used by the court in *Dickson,* in which Justice Story addressed a proviso which limited the total compensation paid to United States receivers of moneys for the public lands. 40 U.S. (15 Pet.) at 165.

The body of subsequent case law applying this rule confirms our belief that its foundation lies in cases involving phrases or clauses delineating exceptions to statutes. The Supreme Court has applied this rule in cases involving various provisos and exceptions to federal laws. *See United States v. First City Nat'l Bank of Houston,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (exception from prohibition on anticompetitive bank mergers); *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953) (statutory exemption from registration requirement under Securities Act of 1933); *Spokane & Inland Empire R.R. Co. v. United States,* 241 U.S. 344, 350, 36 S.Ct. 668, 671, 60 L.Ed. 1037 (1916) (exception from law requiring automatic train couplings); *FTC v. Morton Salt Co.,* 334 U.S. 37, 44–45, 68 S.Ct. 822, 827, 92 L.Ed. 1196 (1948) (exception from antitrust prohibition); *Schlemmer v. Buffalo, Rochester & Pittsburg Ry. Co.,* 205 U.S. 1, 10, 27 S.Ct. 407, 408, 51 L.Ed. 681 (1907) (same exception addressed in *Spokane).* In what one might view in hindsight as a harbinger, the Court applied this rule of statutory construction in a contract dispute where one party sought the benefit of a proviso in the contract. *Javierre v. Central Altagracia,* 217 U.S. 502, 508, 30 S.Ct. 598, 599, 54 L.Ed. 859 (1910).

An important distinction exists between exceptions to statutory regimes and exclusions from the class of entities defined as within the reach of a statutory regime. Separate provisos or exceptions curtail or restrict the operation of a statute in a case to which it would otherwise apply. Title VII can not, *by definition,* apply to private clubs because they are defined as without the reach of the statute. There is no exception contained in § 2000e(b); private clubs are defined not to be employers. The exclusion is incorporated in the definition.

Nor does the interpretive principle of broad construction associated with remedial legislation strike us as persuasive. It is on this point that we find the Supreme Court's statement in *Rodriguez v. United States* particularly prescient:

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (emphasis in original). In this case, we do not see how a broad interpretation of Title VII consistent with its purposes translates to allocating the burden of proof to the Club. Congress defined private clubs as outside the ambit of Title VII, and it is difficult to imagine how any rule of statutory construction could necessitate the sacrifice of so explicit a legislative directive.

No court has satisfactorily explored the distinction between exceptions or provisos to statutes and exclusions of certain entities from the defined class of entities covered by statutes. Instead, this distinction has been

obscured by a jurisprudential practice in which a court applies a time-honored rule of construction without examining whether the doctrinal basis for that rule has any real relevance to the case at hand. It seems to us that the rule allocating the burden of proof to one seeking the benefit of a statutory exception has been allowed to mutate to its present form in which the rule has escaped the confines of its basis in reason. The distinction between statutory exceptions and definitional exclusions may hold important differences in the rules for allocating burdens of proof. We are constrained, however, to acknowledge that incorporating our views on this issue in our judgment of this appeal would overstep the bounds of our appellate jurisdiction.

## C. The Club's standing to raise burden of proof issue on appeal

 It is unusual, although not impermissible, for a party to appeal from a judgment in which it prevailed. *LaBuhn v. Bulkmatic Transp. Co.,* 865 F.2d 119, 121 (7th Cir.1988). Prevailing parties may seek appellate review of what they view as unfavorable findings if those findings are necessary components of the judgment. *California v. Rooney,* 483 U.S. 307, 311–13, 107 S.Ct. 2852, 2854–55, 97 L.Ed.2d 258 (1987) (per curiam); *Electrical Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 242, 59 S.Ct. 860, 861, 83 L.Ed. 1263 (1939). In addition to the necessity requirement, we have held that a prevailing party has standing to appeal only if the judgment is "adverse to him in some respect." *First Nat'l Bank of Chicago v. Comptroller of the Currency of the United States,* 956 F.2d 1360, 1363 (7th Cir.) (citing cases), *cert. denied,* 506 U.S. 830, 113 S.Ct. 93, 121 L.Ed.2d 55 (1992).

 These prerequisites of necessity and adversity reflect the maxim that the courts of appeals "review[ ] judgments, not statements in opinions." *Black v. Cutter Lab.,* 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956). A judgment is the resolution of the

case or controversy, not a statement or intermediate finding to which the prevailing party might take exception. *Abbs v. Sullivan,* 963 F.2d 918, 924 (7th Cir.1992). The resolution of the present case was the denial of EEOC's requested injunctive and declaratory relief. The district court premised its denial upon a finding that the Club is not within the ambit of Title VII's definition of employer. The district court's methodology in reaching this decision was unimportant. The result would have been no different had the district court allocated the burden of proof to EEOC because the undisputed facts demonstrate no plausible conclusion other than the one reached by the district court.

 In addition, the district court's finding is not sufficiently adverse to the Club to warrant standing. A ruling or finding contained in a judgment may be sufficiently adverse if that finding may have preclusive effect in a subsequent proceedings. *New York Tel. v. Maltbie,* 291 U.S. 645, 646, 54 S.Ct. 443, 443, 78 L.Ed. 1041 (1934); *United States v. Good Samaritan Church,* 29 F.3d 487, 488–89 (9th Cir.1994); *In re DES Litigation,* 7 F.3d 20, 23 (2d Cir.1993).[2] In this instance, the district court found that as a matter of law, the structure of § 2000e(b) required the Club to prove its exclusion. This finding in no way subjects the Club to any additional exposure, nor does it preclude the Club from contesting this finding in any subsequent proceeding.

 The courts of appeals do not possess the discretion to exercise revisionary jurisdiction over questions that may strike their fancy. *See United States v. Marshall,* 83 F.3d 866, 868–69 (7th Cir. 1996). It would be inappropriate for us to resolve the question of statutory construction posed by the Club, although our discussion should indicate that we believe it warrants such attention.

## D. Lack of cross-appeal

 The fact that the Club did not file a cross-appeal would also complicate our ability to resolve this important issue even if

---

**2.** We have recently questioned the potential circularity of this requirement. *See LaBuhn,* 865 F.2d at 122 (collecting authority). The circularity argument requires acceptance of the principle

that an unappealed but readily appealable finding has no collateral estoppel effect. Thus, the prevailing party's fear prompting his appeal is justified only after the resolution of his appeal.

standing were present. Justice Cardozo instructed almost sixty years ago that an appellee may not, in the absence of a cross-appeal, challenge any aspect of the lower court decision with a view toward adversely affecting the rights of the appellant. *Morley Constr. Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191–92, 57 S.Ct. 325, 327–28, 81 L.Ed. 593 (1937). Nor may an appellee seek a modification of the judgment so as to enlarge its own rights flowing from the judgment. *See Sims v. Mulcahy,* 902 F.2d 524, 545 (7th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990); *Pearl v. Keystone Consol. Indus., Inc.,* 884 F.2d 1047, 1052–53 (7th Cir.1989). Should the appellee seek such modification(s), it must file a cross-appeal. *Id.*

The Club's argument that the district court improperly allocated to it the burden of proving its qualification under the § 2000e(b) exemption is not an effort to enlarge its own rights within the four corners of the judgment. It would, however, adversely affect the rights of EEOC. Although the essence of a case or controversy is the parties' presentation of evidence and arguments in support of their respective positions, the resolution of a dispute depends upon one party's ability to meet its burden of proof. The rule of law is thus a product of the rule of procedure that governs the exploration and application of substantive law in the context of cases or controversies. This rule of procedure embodies the text of the federal rules and the allocations of burdens of proof. It is through these allocations that the trier of fact or law—be it judge or jury—determines whether a party is entitled to its requested relief.

The prescriptive rules allocating burdens of proof determine the magnitude of evidence necessary to support a proposition, whether of law or of fact. They also designate the party that bears the burden of demonstrating the proposition. These principles have important ramifications for the applicability of legal propositions in varying contexts. *See* Gary Lawson, Proving the Law, 86 Nw. U.L.Rev. 859 (1992). EEOC presently enjoys the benefit of what may be an erroneous interpretation of the proper burdens of proof

concerning the definition of employer in § 2000e(b). Were we to give legal force to our views on this issue, EEOC's rights would be adversely affected; it would thereafter be required to prove a magnitude of evidence in support of a legal proposition in similar cases.

## III. PRIVATE MEMBERSHIP CLUB EXCLUSION

The focus of this appeal is the statutory exclusion of bona fide private membership clubs from the defined class of employers found in the Equal Employment Opportunity provisions of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e(b)). Defined employers are required under Title VII (42 U.S.C. § 2000e–8(c)) to maintain records "relevant to the determination of whether unlawful employment practices have been or are being committed," and § 2000e–8(c) also authorizes EEOC to make rules requiring employers to periodically file reports summarizing these records.

An "employer" is generally defined in § 2000e(b) as a person (which includes a range of specifically identified entities) that employs more than 15 persons, and is engaged in an industry affecting commerce. However, specifically excluded from the definition of "employer" in § 2000e(b) are bona fide private membership clubs and other entities such as corporations wholly owned by the United States government. The actual language of the statute reads, in pertinent part:

> The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees ... **but such term does not include ... (2) a bona fide private membership club ... which is exempt from taxation under section 501(c) of the Internal Revenue Code of 1954....**

42 U.S.C. § 2000e(b) (emphasis added). The parties agree that the Club meets the tax-exempt prong of the private club exclusion, and this leaves to us the job of interpreting the phrase "bona fide private membership club" and applying that interpretation to the facts.

## A. EEOC definition of private club

EEOC has promulgated a three-part inquiry for assessing whether an organization qualifies as a private club under § 2000e(b). EEOC's policy statement, which is contained in its compliance manual, states that an organization is a bona fide private membership club if: (1) it is a club in the ordinary and common meaning of that word; (2) it is private; and (3) it requires meaningful conditions of limited membership. EEOC POLICY STATEMENT: BONA FIDE PRIVATE CLUB EXEMPTIONS, Notice N–915, at N:3172 (July 22, 1986), *contained in* 2 EEOC COMPLIANCE MANUAL § 605, at 605–25. EEOC adopted this guideline to conform to the Fifth Circuit's interpretation of "bona fide" in *Quijano*, 617 F.2d at 131. EEOC POLICY STATEMENT, at N:3172.

The same policy statement also elaborates on the EEOC's definition of "private":

With respect to the requirement that the club be private, the Commission will consider such factors as:

(1) the extent to which it limits its facilities and services to club members and their guests;

(2) the extent to which and/or the manner in which it is controlled or owned by its membership; and

(3) whether, and, if so, to what extent and in what manner it publicly advertises to solicit members or to promote the use of its facilities or services by the general public.

*Id.* at N:3173. With respect to conditions of membership, EEOC identifies the membership's size, limitations thereon, and eligibility requirements as relevant considerations. *Id.*

The Club does not endorse EEOC's policy statement as a correct interpretation of what Title VII requires (or ought to require) for an organization to meet the private club exclusion. Interestingly, EEOC also seems to discount the policy statement's controlling effect, for a prominent feature of its argument is an analogy to the associational freedom concerns that characterize some Title II jurisprudence. As we conclude below, this analogy is inappropriate.

EEOC spends a great deal of effort promulgating guidelines like the policy statement excerpted above, and it is curious that EEOC accords it cursory reliance in a case in which it is directly applicable. This suggests EEOC's recognition that it had no proper basis going after the Club under its own established interpretation of § 2000e(b). It can be concluded that the actual aim of this lawsuit was to change the rules of the game so as to facilitate EEOC's implementation of its ambitious agenda for oversight of private clubs under Title VII.

## B. EEOC claims (1) Title VII's application would not infringe upon right of association, and (2) that the Club is not really private

EEOC offers two arguments why the Club does not qualify as a bona fide private membership club under § 2000e(b). The first is more analogy than argument. EEOC claims that the Club has not demonstrated that application of Title VII would infringe upon any constitutionally protected right of association. The premise of this assertion is an analogy from the legislative history and case law of Title II, which forbids discrimination in places of public accommodation, to what EEOC imagines Congress intended when it drafted Title VII.[3] EEOC argues that application of this constitutional litmus test comports with the general rule that exceptions to remedial statutes are to be narrowly construed. It also identifies support in the broad language of several Supreme Court cases addressing the statutory exception for private clubs carved out of Title II.

The second of EEOC's arguments confines itself to the text of § 2000e(b) and EEOC's understanding of the meaning of that language. EEOC denies that the Club is truly private or that it has meaningful conditions of limited membership. As our discussion below suggests, there is a distinction between a lack of membership criteria memorialized in writing and a failure to implement meaningful and selective criteria in the membership admission process. EEOC seems concerned both with a lack of standardized

---

**3.** There is no legislative history for the private club exclusion of § 2000e(b).

criteria and with what it views as a recent trend away from rigorous enforcement of the traditional criteria as a consequence of the Club's effort to boost membership.

### 1. Title VII and associational liberty interests

EEOC's analogy to the legislative history of Title II is inappropriate for several reasons. First and foremost, there is no need to resort to any legislative history— let alone the history of an entirely different statutory scheme—if the text of a statute is clear. *See Barnhill v. Johnson,* 503 U.S. 393, 401–02, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992). The text of § 2000e(b) is not beset with internal inconsistencies nor is it burdened with vocabulary that escapes common understanding. We will give these words their ordinary meaning and common effect. *See Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993).

The analogy also disregards the important differences between the respective purviews of Title II and Title VII. While the overriding goal of the Civil Rights Act of 1964 was to eliminate discrimination and to create disincentives to discriminate, the exception for private clubs in Title II, *see* 42 U.S.C. § 2000a(e), recognized an inevitable tension between the nondiscrimination directive and the constitutionally protected interest in choosing social intimates. The purpose of Title II is to eliminate "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul,* 395 U.S. 298, 307–08, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969). In cases where application of Title II is claimed to work an invasion of protected associational interests, it is appropriate (and necessary) to determine the extent to which the intrinsic or instrumental features of associational liberty are implicated. *See Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984).

We see no clear nexus between either feature of associational liberty implicated by the application of Title II and employment decisions made by private clubs. The relationships between members of a private club and the club's employees are not the types of personal bonds that are instrumental to the transmission of shared ideals or beliefs. Nor does the sustenance of these relationships consist of deep emotional or spiritual attachments that would warrant First Amendment protection. A private club's employment decisions are not constitutionally relevant to the individual members' abilities to define their own identities by choosing with whom they wish to associate. As the Club points out, the decision whom to include in a private membership organization is a far cry—in constitutional terms—from the decision whom to hire as an employee of such an organization. Accordingly, the first amendment associational liberty concerns have little import for our analysis of the private club exemption in Title VII.

On this point, we find the district court's and the Club's use of language from *Rodriguez v. United States,* 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987), to be puzzling. Certainly, it is true that "no legislation pursues its purposes at all costs" and that a statute's end does not justify any rationally related means. *Id.* at 525–26, 107 S.Ct. at 1393. This caution, however, assumes that application of the Title II associational liberty framework somehow furthers the primary objective of Title VII. We disagree with this premise because the two regimes impact qualitatively different relationships.

EEOC's argument is a red herring; the Club does not claim that application of Title VII would work a constitutional deprivation. EEOC apparently hopes to graft an additional requirement to the checklist of factors for determining whether an organization qualifies as a private membership club. Where, as here, we are able to divine the meaning of a statute's text from the common and ordinary meaning of its constituent words, we will not delve into the netherworld of legislative history of an entirely different statutory scheme.

### 2. The qualifications of a bona fide private membership club

The appropriate inquiry is whether the Club qualifies for the § 2000e(b) private club

exclusion under the commonly applied meaning of the terms used in the statute. EEOC asserts that the Club is not truly private and that it does not possess or employ meaningful conditions of limited membership common to bona fide private clubs. We find these remarkable assertions by the EEOC to have no basis in fact or logic.

### a. *The Club is private*

■ Again, EEOC's own policy statement instructs that a club's privacy is to be evaluated according to three factors:

(1) the extent to which it limits its facilities and services to club members and their guests;

(2) the extent to which and/or the manner in which it is controlled or owned by the membership; and

(3) whether, and, if so, to what extent and in what manner it publicly advertises to solicit members or to promote the use of its facilities or services by the general public.

EEOC POLICY STATEMENT, at N:3173. Like the district court in *University Club*, a case on which EEOC places great reliance, we believe that this policy statement accurately reflects "the state of the law." 763 F.Supp. at 988. It comports with the definition of private as "intended for or restricted to the use of a particular person or group or class of persons[;] not freely available to the public." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1804 (Merriam–Webster 1986).

EEOC admits that "the Club is owned and controlled by its membership and does not advertise that its facilities are open to the general public." The only remaining issue, therefore, seems to be whether the Club limits access to its facilities to members and their guests.

EEOC suggests a different approach; it states that the Club's privacy turns upon its "size, public access to and use of [the Club's] facilities, its guest criteria, and whether its activities are subsidized by nonmember income." This is a clumsy attempt to avoid the consequences of EEOC's own interpretation of "private" contained in its compliance manual and only undermines EEOC's credibility in future cases where it may ask this or another court to rely on that interpretation. *See Dothard v. Rawlinson,* 433 U.S. 321, 334 & n. 19, 97 S.Ct. 2720, 2729 & n. 19, 53 L.Ed.2d 786 (1977) (EEOC's consistent adherence to interpretive guideline entitles it deference in its statutory construction).

■ The size of an organization is not, without more, probative of its privateness. *Cf. Welsh v. Boy Scouts of America,* 993 F.2d 1267, 1276–77 (7th Cir.) (reasoning that the numerical strength of an organization is not inversely proportional to its selectivity), *cert. denied,* —— U.S. ——, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). An organization's size may inform its private or nonprivate status to the extent that it illuminates the organization's membership admission practices. In the present case, there is no evidence that the Club's size holds any clues to its membership admission practices. The Club's membership totaled 1,247 at the time this lawsuit began, and this figure is well below the limit of 1,400 authorized by the bylaws.

EEOC suggests that the Club is engaged in a member recruitment drive to increase revenue. But that is of no moment. Prudently increasing membership to increase revenue while not abandoning selective membership practices exhibits nothing more than fiscal responsibility. Moreover, the undisputed facts suggest that the Club is proceeding in deliberate and selective fashion by neither approaching nor moving to amend the bylaw-prescribed limit.

EEOC claims that the undisputed facts belie any claim that the Club limits the use of its facilities to members and their guests. It states that "[n]onmembers have little to no restrictions on their access to and use of [Club] facilities." This astounding conclusory assertion has no support in the record. Nonmembers are allowed access to the Club only as authorized guests of members. It is true that guests, if issued a guest card, may invite other nonmember guests to the Club. But this does not translate to "unrestricted access" as EEOC suggests, nor are the privileges that attach to a guest card coextensive with membership privileges.

EEOC's claim that the Club "lacks any meaningful guest criteria" is similarly baseless. The criteria is that a guest must be invited to the Club by a member. The depth and intimacy to which a member knows the guests is irrelevant; that the member knows them enough to invite them is the end of the matter. The suggestion that the private club exemption requires a certain level of intimacy between members and their invited guests is, to say the least, ridiculous.

EEOC makes much of the Club's practice of allowing its members to host private functions involving nonmember organizations. The undisputed facts show that hosting members were present at these functions and were in some manner affiliated with the organizations involved. In addition, the facts also show that the members were ultimately responsible for the ensuing bills. The fact that the bill might be paid directly or indirectly by the nonmember organization is of no consequence. It is common practice for business people to entertain colleagues and host functions or lunches at private clubs and then be reimbursed for the costs by an employer or professional association. It flies in the face of reality to suggest that the Club's privacy is compromised because nonmember organizations ultimately foot the bill for functions conducted at the Club and hosted by a member.

The record does illustrate two occasions where nonmember organizations made use of the Club's facilities without a hosting member. On one occasion, Frank Stover, the Club's general manager, hosted a reception for Roosevelt University students. The second occasion involves the Swedish Culinary Team taking up temporary residence in the Club's kitchen to prepare for a competition. Neither of these isolated incidents is a significant breach of the Club's privateness. Mr. Stover obviously dedicates the bulk of his time catering to the needs and interests of the Club's membership. It is not only logical but fitting that the Club might extend the courtesy of making a room available for him to host a student-oriented function. As for the much-ballyhooed Swedish culinary affair, this appears to represent nothing more than an effort by the Club to contribute to the success of a competition hosted by the city of Chicago at a time when its kitchen was otherwise not in use. These instances give us no pause whatsoever in concluding that the Club is indeed private.

b. *The Club employs meaningful conditions of limited membership*

 EEOC correctly states that selective membership practices are the essence of private clubs. Decisions concerning a club's membership expansion are to individual members significant as their own decisions to join the club. One presumably affiliates with a private club because of the community of interests or agendas shared by the membership. The integrity of those common interests or agendas has much at stake in the membership selection process, and membership participation in the selection of new members is a crucial attribute of a private club. By participating in the selection process, members guarantee that the interests they share with other members will continue to bind the membership in the future.

The undisputed facts suggest that the members of the Club exercise complete autonomy in the selection process. They may propose and second candidates for consideration and comment upon those that have been proposed and seconded by others. The members elect a board of governors to which they delegate the authority to make final decisions concerning membership invitations. There is no evidence that members of the board disregard the membership's comments in reaching decisions. In fact, it is doubtful they would remain on the elected board if they did. Nor is there any evidence that the board has acted contrary to the wishes of the membership in its extension of membership invitations pursuant to its authority under the bylaws.

The Club's tradition of member selection requires that a proposal or second for membership invitation rest upon the member's personal knowledge of the candidate and his or her suitability for membership. That the Club's bylaws do not painstakingly describe the subtleties inherent in this personal screening process in no way diminishes the practical significance of this practice. In-

deed, the very nature of a private club suggests this practice to be the best available course. Members of a private club share more than interests or agendas; they often share values as well. Part of the value system that binds members of a private club is a common understanding of who belongs inside the circle and who does not.

A private club is a group of individuals who imagine the membership as a personification of whatever priorities or interests the club professes to embrace. Whether these priorities or interests are laudatory or mundane is beside the point, which is that they are shared by a group who have chosen their social intimates on the basis of these values. The shared understanding of what is important and what is not heavily influences the process by which members decide upon appropriate additions to their ranks. We doubt that in such a regime there could be a more fitting or efficient system for selecting members than the intensely personal screening procedure used by the Club. *Compare University Club,* 763 F.Supp. at 989 (meaningful conditions of limited membership lacking where there is no evidence that members prescreen candidates). This screening procedure has withstood the test of time and is apparently quite effective. The undisputed facts demonstrate that the Club is extremely selective in admitting new members. The breakdown of the 481 most recently admitted members recited above undermines any claim that the Club does not employ meaningful selection criteria. That these criteria are not memorialized in writing makes no difference; the results speak for themselves.

EEOC suggests that the Club's effort to attract "commodity brokers, lawyers, and younger mid-level corporate executives" as new members manifests a sharp decline in selectivity. This is a discrete socioeconomic distinction that has little significance in the larger picture. The Club is not deviating from its longstanding admission practices in admitting brokers, lawyers, or mid-level corporate executives. Although it is true that the Club's effort to expand membership entails some broadening of the eligible talent pool, this expansion of acceptable professional accomplishment incident to the Club's

membership recruitment hardly destroys its selectivity.

One further point is appropriate because of the EEOC's approach in this litigation. We emphasize that by no stretch of the imagination should the practices of the Club outlined above be considered the minimum necessary to qualify as a bona fide private membership club under § 2000e(b). To the contrary, it is clear that less stringent membership policies and guest arrangements than those employed by the Club would easily meet § 2000e(b)'s bona fide private membership club requirements.

## IV. CONCLUSION

The facts are undisputed, and it is absolutely clear that the Club is entitled to summary judgment as a matter of law for it more than easily qualifies under the bona fide private membership club exemption of § 2000e(b). As even the casual reader may no doubt detect, we are astounded by EEOC's decision to pursue this lawsuit in the face of the overwhelming evidence of the Club's selective membership admission and restricted guest practices. As one member of this panel asked counsel for EEOC at oral argument: "If the Chicago Club isn't a private club then what is?" In the face of the undisputed facts, we are also amazed by EEOC's adamant refusal to acknowledge at oral argument that it may have overreached in this case. In a city with a storied tradition of private clubs, "all lists [of private clubs] begin with the Chicago Club. It is relevant to the city in the way elephants and lions are relevant when they stroll down to the water hole." Michael Kilian, *For Members Only,* CHI. TRIB., April 21, 1996, § 10 (Magazine), at 14, 18. In the hopes of altering the playing field for all private clubs under Title VII, EEOC decided to go after the biggest fish in the pond. In the process, it has diminished its reputation and needlessly squandered both its own resources and those of the federal courts.

The order granting summary judgment in favor of the Chicago Club is AFFIRMED.