[No. 39180-1-I. Division One. February 17, 1998.]

TINA KAHN, *Appellant*, v. CHARLES SALERNO, ET AL.,
*Respondents.*

*Terry E. Thomson* and *Aaron S. Okrent* of *Sternberg Thomson & Okrent*, for appellant.

*Curman M. Sebree*, for respondents.

KENNEDY, J. — Tina Kahn appeals the trial court's order granting summary judgment to Charles Salerno and Kristen Salerno, husband and wife, and Armand Lee Hoch and Melody Hoch, husband and wife, contending that genuine issues of material fact exist with respect to her hostile work environment, retaliatory termination, and fraud claims. We agree and reverse.

## FACTS

From September 1991 until her discharge in March 1994, Appellant Tina Kahn worked part-time on a flexible work schedule at Salerno Agency, a life insurance agency owned by Respondents Charles Salerno (Salerno) and Kristen Salerno. During that time, Respondents Armand Lee Hoch (Hoch) and his wife, Melody Hoch, also worked for Salerno Agency. Although Kahn was initially hired as a clerical employee, Salerno increased Kahn's responsibilities and gave her new titles, including "functional specialist," "recruiter," and "human resources person." Kahn maintains that Salerno consistently praised her job performance and never reprimanded her. But Salerno contends that he reprimanded her on several occasions because she was rude to Hoch. Kahn also contends that Salerno described her interpersonal skills as "excellent." Salerno maintains that Hoch's clients complained that Kahn was rude to them on the phone. Nonetheless, Salerno gave Kahn at least two pay increases during her employment, the most recent occurring in January 1994, one month before she was

discharged. In her final performance review, Salerno commended Kahn on her professional appearance, her ability to relate well to clients, and her work on recruiting and licensing of prospective sales agents. Kahn maintains that Salerno did not criticize her work in this or any other performance review.

Employees at Salerno Agency describe Hoch as a physically intimidating, large man with a commanding presence and a booming voice. In the office, Hoch would frequently lose his temper, bang office walls, and throw objects. Kahn maintains that Hoch "would often launch into the most intimidating, vile, and despicable verbal abuse . . . [that] could last for hours or all day." Clerk's Papers at 444-45. She contends that this behavior was directed at sales agents or employees of "whatever sex." Clerk's Papers at 446. Michael Smiton, a former office manager, described Hoch's behavior:

> In my opinion, any normal, well-adjusted human being, male or female, would reasonably fear for his or her physical safety when Lee Hoch was embroiled in one of his prolonged outbursts. I was concerned on occasion about my own physical safety and having to defend myself, when I was the target of his tirades.

Clerk's Papers at 473. Kahn also felt her personal safety was at risk during Hoch's tirades. In addition, Hoch used the words "fuck," "fucking," "bitch," "god damn bitch," and "fucking bitch" in his conversations with Kahn. Clerk's Papers at 447. She alleges that Hoch looked her up and down, and stared at her breasts. In addition, Kahn alleges that Hoch's tone, volume, facial gestures, physical gestures, and mannerisms "took on very uncomfortable and disturbing sexual overtones." Clerk's Papers at 446.

Kahn complained to Salerno about Hoch's behavior on many occasions. Salerno attempted to remedy the situation by working with Hoch to improve his office conduct and, ultimately, by moving Hoch to a different floor in the office building. Salerno's actions initially reduced Kahn's contact

with Hoch, but the confrontations with Hoch ultimately resumed.

In late February 1994, Salerno decided to discharge Kahn. Although Kahn contends he made this decision because of her complaints about Hoch's language and behavior, Salerno asserts it was because he was not pleased with Kahn's behavior in recent days. In addition, despite the wholly positive performance review he gave Kahn one month earlier, Salerno maintains that he was dissatisfied with the quality of her work over the prior three to six months. On February 28, 1994, Salerno requested that Kahn resign in lieu of termination. Kahn claims that she asked Salerno if she had a choice, and that Salerno responded, "no." Clerk's Papers at 454. In a termination memo, Salerno explained, "I wouldn't be a good friend or boss if I allowed you to remain in an environment that you were not comfortable with." Clerk's Papers at 621. He mailed Kahn a written notice of termination effective March 9, 1994.

On September 26, 1994, Kahn filed a suit against Salerno and Hoch in King County Superior Court. Against Salerno, she alleged negligent retention and supervision of Hoch, the creation and maintenance of a hostile work environment (sexual harassment), retaliatory termination of Kahn for reporting the hostile work environment, and fraud in withholding her health benefits. Against Salerno and Hoch, she alleged knowing, reckless, or negligent infliction of emotional distress, and violations of the Washington Consumer Protection Act (CPA).[1] The trial court granted partial summary judgment on December 5, 1995, dismissing the hostile work environment, retaliation, fraud, and CPA claims, but denied summary judgment as to the negligent retention and supervision, and reckless or negligent infliction of emotional distress claims. The trial

---

[1] In a document filed with the trial court, Kahn conceded the absence of any per se CPA violations and, accordingly, asked the trial court to dismiss her CPA claim. At that time, Kahn suggested that she might allege non-per se violations of the CPA; but she failed to do so. Because Kahn has abandoned this claim, we do not consider an appeal of the dismissed CPA claim.

court then granted Kahn's CR 41(a) motion for the voluntary dismissal of her remaining claims. This appeal followed. Salerno requests attorney fees on appeal.

## DISCUSSION

■ When reviewing an order granting summary judgment, this court engages in the same inquiry as the trial court. *White v. State*, 131 Wn.2d 1, 8-9, 929 P.2d 396 (1997); *Fisher v. Aldi Tire, Inc.*, 78 Wn. App. 902, 906, 902 P.2d 166 (1995), *review denied*, 128 Wn.2d 1025 (1996). All facts and reasonable inferences must be considered in the light most favorable to the nonmoving party. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). We will affirm an order granting summary judgment if there are no genuine issues of material fact, *i.e.*, if from all of the evidence, reasonable persons could reach but one conclusion and the moving party is entitled to judgment as a matter of law. CR 56(c); *Wojcik v. Chrysler Corp.*, 50 Wn. App. 849, 854, 751 P.2d 854 (1988).

■ The party moving for summary judgment has the initial burden of showing there is no dispute as to any issue of material fact; but once that burden is met, the burden shifts to the nonmoving party to establish the existence of an element essential to its case. *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66, 837 P.2d 618 (1992). "In order for a plaintiff alleging discrimination in the workplace to overcome a motion for summary judgment, the worker must do more than express an opinion or make conclusory statements." *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996) (citing *Grimwood v. University of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988)). To defeat summary judgment, the employee must establish specific and material facts to support each element of his or her prima facie case. *Id.* (citing *Hiatt*, 120 Wn.2d at 66-67).

I. Hostile Work Environment

■ Washington's Law Against Discrimination, ch.

49.60 RCW, protects employees from sexual harassment; one form of sexual harassment is maintaining a hostile work environment.[2] *Coville v. Cobarc Servs., Inc.*, 73 Wn. App. 433, 438, 869 P.2d 1103 (1994) (citing *Glasgow v. Georgia-Pac. Corp.*, 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)). Gender-based harassment, which need not be sexual in nature, is actionable as discrimination under this statute. *Payne v. Children's Home Soc'y*, 77 Wn. App. 507, 513, 892 P.2d 1102, *review denied*, 127 Wn.2d 1012 (1995). Chapter 49.60 RCW provides, in relevant part, as follows: "It is an unfair practice for any employer . . . [t]o discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability[.]'" RCW 49.60.180(3).

■ Laws against discrimination are "not directed against unpleasantness *per se.*" *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) (quoting *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1009 (7th Cir. 1994)); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). There is a line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing. *Carr*, 32 F.3d at 1010. Simple vulgarity does not give rise to a cause of action. "[I]t is not any and all harassment that is actionable under [laws against discrimination] . . . but (for our purposes here) only harassment that is in some way linked to the plaintiff's sex." *Doe v. City of Belleville*, 119 F.3d 563, 570 (7th Cir. 1997) (citing *Carr*, 32 F.3d at 1009). We emphasize this distinction to prevent leaving a contrary impression in the course of this opinion.

■ To establish a prima facie case for workplace

---

[2]Because Washington's laws against discrimination substantially parallel Title VII, we look to federal law for guidance when state case law does not decide all issues. *Russell v. Department of Human Rights*, 70 Wn. App. 408, 854 P.2d 1087 (1993). But, because our Law Against Discrimination contains a provision requiring liberal construction not contained in Title VII, we are not bound by federal law. *Hiatt v. Walker Chevrolet Co.*, 64 Wn. App. 95, 99 n.2, 822 P.2d 1235 (1992) (citing *Allison v. Housing Auth.*, 118 Wn.2d 79, 821 P.2d 34 (1991)).

harassment, the employee must identify the offensive contact and then prove that it is unwelcome, occurred because of sex or gender, affected the terms or conditions of employment, and can be imputed to the employer. *Doe v. Department of Transp.*, 85 Wn. App. 143, 148, 931 P.2d 196, *review denied*, 132 Wn.2d 1012 (1997); (citing *Glasgow*, 103 Wn. 2d at 406-07); *Coville*, 73 Wn. App. at 438.

A. Offensive Contact

Kahn identifies the offensive contact as Hoch's frequent use of the words "fuck," "fucking," "bitch," "god damn bitch," and "fucking bitch" in conversations with her, and his looks directed at her and stares at her person that "took on very uncomfortable and disturbing sexual overtones." Clerk's Papers at 446-47. In addition, Kahn points to evidence in the record of Hoch's offensive conduct toward Kahn, including his blatant attempt to look down her cleavage and a subsequent hand gesture emphasizing the size of her breasts. Thus, we conclude that Kahn has identified specific and material facts to support the first element of her hostile work environment claim.

B. Unwelcome Contact

"Conduct is unwelcome if the employee does not solicit or incite it, and regards it as undesirable or offensive." *Schonauer v. DCR Entertainment, Inc.*, 79 Wn. App. 808, 820, 905 P.2d 392 1995) *review denied*, 129 Wn.2d 1014 (1996) (citing *Glasgow*, 103 Wn.2d at 406).

1. Kahn's Conduct in the Workplace

Salerno argues that the conduct was not unwelcome because Kahn reciprocated, and, in doing so, contributed to the sexually-charged work environment. Salerno contends that Kahn initiated inappropriate conduct of a sexual nature with Salerno and with Jim Paxton, a male employee working in the agency's Anchorage office. Salerno maintains that Kahn made sexual advances, wore revealing clothing, and engaged in "very graphic sexual telephone conversations" and e-mail correspondence with Paxton and

with him. Clerk's Papers at 79. Yet, the record contains no evidence to indicate that Kahn participated in any conduct of a sexual nature with Hoch. Moreover, Salerno's contention that Kahn wore revealing clothing is presumably rebutted by his final performance review commending Kahn on her professional appearance.

Salerno relies upon *Reed v. Shepard*, 939 F.2d 484 (7th Cir. 1991), for the proposition that conduct is not unwelcome if the employee participates in the conduct. *Reed*, 939 F.2d at 491. But the facts in *Reed* are distinguishable from the present case. In *Reed*, the employee manifested "enthusiastic receptiveness to sexually suggestive jokes and activities." *Reed*, 939 F.2d at 491. Here, even if Salerno's allegations about Kahn's behavior toward him and Paxton prove to be true, the record does not support a finding of Kahn's "enthusiastic receptiveness" to Hoch's conduct. Moreover, the employee in *Reed*, did not complain about the sexually-charged work environment to anyone at the workplace. *Id*. at 487. Here, Kahn complained to Salerno on many occasions. Thus, Salerno's reliance upon *Reed* is misplaced. Salerno's contention that Kahn solicited or encouraged Hoch's conduct is unsupported by the record.

### 2. Kahn's Use of Offensive Language

Next, Salerno maintains that Kahn used the terms "fuck," "fucking," and "bitch" in reference to herself, Hoch, and others. In response, Kahn admits that she probably said "fuck you" or something derogatory to Hoch; she characterizes this as a defensive tactic in response to something he said to her. Kahn also admits that she used the word "bitch" one time, in reference to herself, when she said that she did not mind being the "bitch" in order to get something done in the office. Still, she contends that she found Hoch's language to be "terribly degrading, intolerable, humiliating and outrageous." Clerk's Papers at 447. Nonetheless, because Kahn has used foul language herself, Salerno asserts that she could not have been offended when she heard Hoch use similar language.

In a recent Seventh Circuit case, Judge Posner observed, "there is no principle of law, or for that matter of psychology, that decrees that the use of bad language automatically demonstrates the user's insensitivity to like language directed against himself or herself." *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996). The court explained that an employee's use of bad language may be defensive or playful in an effort to improve relations with hostile or threatening coworkers. *Id.* In an earlier opinion, the Seventh Circuit concluded that male employees' offensive words and conduct were unwelcome to a female employee, despite her own abusive language and crude behavior. *Carr*, 32 F.3d at 1010-11. The trial court had determined that the supervisor's conduct was not actionable because it was invited. The Seventh Circuit reversed, explaining that "her words and conduct cannot be compared to those of the men and used to justify their conduct and exonerate their employer." *Id.* at 1011. Similarly, the Fourth Circuit reversed a trial court's conclusion that a supervisor's use of foul language directed at an employee was not unwelcome because that employee had used similar language. *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987). The Fourth Circuit opined that her "use of foul language or sexual innuendo in a consensual setting does not waive her legal protections against unwelcome harassment." *Id.* (citation and internal quotation marks omitted).

In the present case, Kahn maintains that her use of foul language was defensive, in response to something Hoch said to her. Unlike the facts of *Galloway*, the record here does not support an inference that Kahn's use was an attempt to improve relations with Hoch. *See Galloway*, 78 F.3d at 1167. Nonetheless, the record does support an inference that Hoch's language and conduct were not invited. Thus, we conclude that Kahn did not waive her legal protections against unwelcome harassment by using foul language. *Cf. Swentek*, 830 F.2d at 557.

"[T]he question whether particular conduct was indeed

unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). Because a reasonable trier of fact could find that Kahn did not solicit or incite Hoch's conduct, and that she regarded it as undesirable or offensive, she has established specific and material facts to support a conclusion that Hoch's conduct was unwelcome. *See Schonauer*, 79 Wn. App. at 820.

C. Occurred Because of Sex or Gender

To prove that the conduct occurred because of sex or gender, Kahn must prove she would not have been singled out and caused to suffer the harassment had she been male. *Doe*, 85 Wn. App. at 148-49 (citing *Payne*, 77 Wn. App. at 514). To defeat a summary judgment motion, Kahn must produce competent evidence that supports a reasonable inference that Hoch's behavior occurred because she was female, i.e., that her sex was the motivating factor for the harassing conduct. *Doe*, 85 Wn. App. at 149 (citing *Coville*, 73 Wn. App. at 438).

Recently, we affirmed an order granting summary judgment on a sexual harassment claim on the basis that Doe, the complaining male employee, was not singled out because of his sex. *Doe*, 85 Wn. App. at 148-50. In *Doe*, we observed that the supervisor "frequently engaged in vulgar and disgusting behavior with strong sexual overtones, much of it directed at Doe." *Id.* at 145. Nonetheless, we concluded that the supervisor singled out Doe because he appeared to be particularly offended by the conduct, not because of his sex.[3] *Id.* at 149-50. Although the supervisor's conduct was reprehensible, it did not give rise to a cause of action under RCW 49.60.180(3). *Id.* at 150.

Here, the record contains depositions from four employees, two women and two men, who found Hoch's conduct to be offensive and degrading. The male employees ex-

---

[3]In *Doe*, unlike the present case, no women were employed in the same work unit; but we did note that the supervisor's treatment of women was every bit as offensive as his treatment of Doe. *Doe*, 85 Wn. App. at 150 n.5.

plained in general terms that Hoch humiliated them and used sexually offensive language toward women; specifically, they acknowledged he used such language toward Kahn. Salerno argues that Kahn was not singled out because of her sex on the basis that other employees, male and female, had similar confrontations with Hoch. Kahn responds that even if Hoch directed the same obscenities at males and females, that his conduct nonetheless constitutes sexual harassment because there is a significant, differential impact of profanity and vulgarity on women.

Kahn admits Hoch's tirades were directed at persons "of whatever sex." Clerk's Papers at 446. But she urges us to reject Salerno's "equal opportunity harasser defense." Kahn relies upon *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082, 115 S. Ct. 733, 130 L. Ed. 2d 636 (1995), and *Zabkowicz v. West Bend Co.*, 589 F. Supp. 780 (E.D. Wis. 1984),·*rev'd in part on other grounds*, 789 F.2d 540 (7th Cir. 1986). In *Steiner*, the Ninth Circuit pointed out that although the supervisor harassed both males and females, the abuse of the female employee was of a gender-specific nature. *Steiner*, 25 F.3d at 1463. The supervisor called the females "dumb fucking broads" and "fucking cunts," while he called the males "assholes." *Id.* at 1463-64. The court concluded that the female employee was sexually harassed, explaining: "Furthermore, even if [the supervisor] used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby 'cure' his conduct toward women." *Id.* at 1464. In *Zabkowicz*, the district court found that the employee was harassed because she was a female on the basis that "the sexually offensive conduct and language used would have been almost irrelevant and would have failed entirely in its crude purpose had the plaintiff been a man." *Zabkowicz*, 589 F. Supp. at 784 (referring to use of the terms "slut," "bitch," and "fucking cunt," among other statements and acts).

In *Russell v. Department of Human Rights*, we addressed a similar issue interpreting discrimination provisions of

Seattle's Fair Employment Practices Ordinance. *Russell v. Department of Human Rights*, 70 Wn. App. 408, 854 P.2d 1087 (1993) (affirming decision of human rights department finding discrimination under Seattle Municipal Code 14.04[4]). In *Russell*, the supervisor claimed that he abused everyone and, therefore, did not subject an African-American female employee to different treatment because of race or sex. *Id.* at 420. But because he was more abusive toward female employees, and because he made specific, derogatory comments about African-Americans to Russell and others, we concluded this was sufficient proof of conduct defined as discriminatory under the Seattle Municipal Code. *Id.* at 420-21; *see Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir. 1993) (explaining that a fact finder could find that conduct was gender based because the supervisor's abuse of women was worse than his abuse of men).

Here, the record contains insufficient evidence to determine whether Hoch was more abusive toward female employees as compared to the male employees. Although Hoch admits referring to Kahn as a "bitch," and using the terms "fucking bitch" and "god damn bitch" in her presence, Salerno maintains that Hoch's frequent use of these terms was in reference to males, females, computers, and situations in general. Salerno asserts that "[t]he term [bitch] is not sexually explicit or sexual nor a reference to women's bodies and sexual conduct." Respondents' Br. at 31-32. Salerno defines "bitch" as "anything especially unpleasant or difficult," or "to behave spitefully or angrily toward." Respondents' Br. at 32.

The complete definition of "bitch" reads as follows:

---

[4]The Seattle Fair Employment Practices Ordinance, Seattle Municipal Code (SMC) 14.04, governs unfair employment practices. The legislation is authorized by RCW 49.60.010. *Russell*, 70 Wn. App. at 411. SMC 14.04 defines discrimination as:

[A]ny act, by itself or as part of a practice, which is intended to or results in different treatment or differentiates between or among individuals or groups of individuals by reason of race, color, age, sex, marital status, sexual orientation, political ideology, creed, religion, ancestry, national origin; or the presence of any sensory, mental or physical handicap.

SMC 14.04.030(F).

*n.* **1.** the female of the dog, wolf, fox, etc. **2.** *a)* [Archaic] a lewd or promiscuous woman *b)* a malicious, bad-tempered, or aggressive woman **3** [Slang] anything especially unpleasant or difficult **4** [Slang] a complaint — *vi* [Slang] to complain — *vt.* [Slang] **1** . . . to bungle . . . **2** to behave spitefully or angrily toward

WEBSTER'S NEW WORLD DICTIONARY (3d College ed. 1988). Salerno conspicuously omits the definitions that contain the words "female" or "woman," and quotes only one noun and one verb definition. Hoch admitted using the word "bitch" in reference to Kahn. Thus, Salerno's contention that Hoch's use of the word only means "anything especially unpleasant or difficult," or "to behave spitefully or angrily toward" is not persuasive.

The Seventh Circuit recently addressed the issue of whether the word "bitch" is a gender-specific term, and whether its use is necessarily because of a woman's sex. *See Galloway*, 78 F.3d at 1167-68. It observed that the word "is simply a pejorative term for 'woman' " and noted that it does not necessarily connote inferior or unworthy female characteristics. *Id.* at 1168. Based upon the context of the word's use in *Galloway*, the court concluded that it did not create an automatic inference that the speaker's motivation was gender-based, rather than on a personal dislike unrelated to gender. *Id.* The court went on to explain: "We do not suggest, moreover, that the word 'bitch' can *never* figure in a sex discrimination case. When a word is ambiguous, context is everything." *Id.*

Here, the record does not provide the context of Hoch's use of the word "bitch" in reference to Kahn. Thus, it is inappropriate for us to decide as a matter of law whether Hoch used the word "bitch" because of Kahn's sex; this determination is for the trier of fact. Nonetheless, we conclude that Kahn produced specific and material facts to support this element of her prima facie case.

D. Affected the Terms or Conditions of Employment

In order to affect the terms or conditions of employment, the conduct must be sufficiently severe and persistent.

*Payne*, 77 Wn. App. at 515. The United States Supreme Court has acknowledged that sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of employment. *Harris*, 510 U.S. at 21 (citing *Meritor*, 477 U.S. at 65, 67). In addition, we have explained:

> Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. The harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. Whether the harassment at the workplace is sufficiently severe and persistent to seriously affect the emotional or psychological well being of an employee is a question to be determined with regard to the totality of the circumstances.

*Payne*, 77 Wn. App. at 515 (quoting *Glasgow*, 103 Wn.2d at 406-07). In addition to considering the frequency and severity of the conduct, we consider "whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *MacDonald v. Korum Ford*, 80 Wn. App. 877, 885, 912 P.2d 1052 (1996) (quoting *Harris*, 510 U.S. at 23). We also consider whether the victim subjectively perceived the environment to be abusive. *Id.*

Kahn contends that she was physically threatened and humiliated by Hoch's conduct but provides details only with respect to a limited number of incidents. Kahn concedes the specific incidents referred to at her deposition were sporadic; but she maintains the offensive conduct was ongoing. In response, Salerno argues that these incidents do not rise to the level of severe and pervasive, contending that Hoch's conduct was a far cry from conduct that constitutes harassment.

Relying on our decision in *MacDonald*, Salerno argues that the level of conduct engaged in by Hoch is not actionable. *MacDonald*, 80 Wn. App. at 885. In *MacDonald*, after rejecting a hostile work environment claim on the ground that it was not severe and pervasive, we described the

supervisor's behavior as inappropriate but mild in comparison to acts that courts have found to create a hostile environment. *Id.* at 887-88 (citing cases involving conduct ranging from an employee's receipt of "bizarre love letters" to an employee being raped). But the present case is distinguishable because it contains additional facts not present in *MacDonald*. In *MacDonald*, the supervisor was not physically threatening and his conduct did not unreasonably interfere with the employee's work performance. *MacDonald*, 80 Wn. App. at 887. Moreover, the employee in *MacDonald* was unsure if the supervisor's conduct had sexual overtones. *Id.* Here, Kahn maintains that she was physically threatened, that Hoch's conduct interfered with her work performance, and that Hoch's conduct had sexual overtones. Based on the evidence in the record, a rational trier of fact could agree. Salerno's reliance upon *MacDonald* is therefore unpersuasive.

The record indicates that Hoch's conduct was ongoing over a period of nearly three years, albeit sporadic during those years. Because reasonable minds could differ on the question of whether the allegedly ongoing abuse constitutes severe and pervasive harassment, this determination is best left for a jury. Thus, we conclude that Kahn produced competent evidence that supports a reasonable inference that the conduct was severe and persistent.

E. Imputed to the Employer

To satisfy this element, Kahn must show that Salerno authorized, knew, or should have known of the harassment, and failed to take reasonably prompt and adequate corrective action. *Glasgow*, 103 Wn.2d at 407. We have explained:

> The employee can show this by proving that complaints were made to the employer's higher managerial or supervisory personnel or by proving the sexual harassment was sufficiently pervasive to create an inference that the employer had actual or constructive knowledge of it. In either event, the employee must also show that the employer's remedial action was not reasonably calculated to end the harassment.

*Doe*, 85 Wn. App. at 148 n.3 (citing *Glasgow*, 103 Wn.2d at 407).

The record reflects that Salerno had actual knowledge of Hoch's conduct. Therefore, to withstand summary judgment, Kahn must raise a genuine issue of material fact regarding whether Salerno's remedial action was reasonably calculated to end the harassment. *Doe*, 85 Wn. App. at 148 n.3. Salerno maintains he took prompt and adequate corrective action to mediate disputes between Kahn and Hoch. But the record indicates that Hoch was never reprimanded or disciplined for his conduct. Kahn argues that Salerno took inadequate action and urges us to infer from the record that Salerno tolerated Hoch's behavior because Hoch was a top sales agent. Because Salerno does not deny that Hoch's abuse continued after the remedial action, we conclude that Kahn has raised a genuine issue of material fact regarding whether Salerno's remedial action was reasonably calculated to end the harassment.

From all of the evidence on the hostile work environment claim, reasonable persons could reach more than one conclusion. Salerno therefore failed to meet his initial burden of showing there is no dispute as to any issue of material fact and Kahn established the existence of each element essential to her case. *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66, 837 P.2d 618 (1992). Thus, we conclude that Salerno is not entitled to judgment as a matter of law on this claim.

## II. Retaliation

 █ Washington recognizes a cause of action for retaliation under the law against discrimination, Chapter 49.60 RCW. This statute provides, in relevant part, as follows: "It is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter[.]" RCW 49.60.210(1). Retaliatory motivation need not be the principal reason for terminating an employee; an employer motivated in part by retaliatory influences who discharges an employee engaged in protected activity is in violation of the statute. *Selberg v. United Pac. Ins. Co.*, 45 Wn. App. 469, 471-72, 726 P.2d 468 (1986). In

order to establish a prima facie case of retaliatory discharge, Kahn must show that she was engaged in a statutorily protected activity, that Salerno discharged her or took some other adverse employment action against her, and that retaliation was a substantial factor behind the adverse action. *Delahunty v. Cahoon*, 66 Wn. App. 829, 840-41, 832 P.2d 1378 (1992) (citing *Allison v. Housing Auth.*, 118 Wn.2d 79, 95, 821 P.2d 34 (1991)). Yet, opposition to an employer's possible discrimination does not enjoy absolute immunity; an employee may still be terminated for proper cause even when engaged in protected activity. *Coville v. Cobarc Servs., Inc.*, 73 Wn. App. 433, 439, 869 P.2d 1103 (1994) (citing *Selberg*, 45 Wn. App. at 472); *Delahunty*, 66 Wn. App. at 841 (citing *Kinney v. Bauch*, 23 Wn. App. 88, 96, 596 P.2d 1074 (1979), *abrogated on other grounds by Allison*, 118 Wn.2d 79)). At trial, Kahn must also show the adverse action was not for proper cause.[5]

Salerno contends he discharged Kahn because he was not pleased with her behavior in the recent days or with the quality of her work over the three to six months prior to this decision. He also suggests that Kahn's alleged absence from the office without permission on February 25 and 26, 1994, was a factor in his decision. Kahn denies being absent from work and contends that Salerno approved of her flexible work schedule. She also contends that Salerno fabricated complaints about her behavior and her work to justify her termination. She alleges that she was discharged because she protested Hoch's conduct and language.

Because it is undisputed that Salerno discharged Kahn, the following sections discuss the three remaining elements of retaliation: whether Kahn was engaged in a statutorily protected activity; whether retaliation was a substantial

---

[5]If the plaintiff establishes a prima facie case, then the defendant may attempt to rebut the case by presenting evidence of a legitimate reason for the employment decision. The burden then shifts back to the plaintiff, who can attempt to prove the employer's reason is pretextual. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991).

factor behind Salerno's termination of Kahn; and whether she was discharged for proper cause. RCW 49.960.210(1).

A. Engaged in a Statutorily Protected Activity

▮▮ ▮▮ Kahn need not prove that her complaints were to behavior that would violate the law against discrimination; but her opposition must be to conduct that is at least arguably a violation of the law. 1 MARK A. ROTHSTEIN, EMPLOYMENT LAW § 3.11 (1994) (construing analogous retaliation provisions of Title VII). "To determine whether an employee was engaged in protected opposition activity, the court must balance the setting in which the activity arose and the interests and motives of the employer and employee." *Coville*, 73 Wn. App. at 439 (citing *Delahunty*, 66 Wn. App. at 840).

Here, the setting in which the activity, Hoch's conduct and language, occurred is an insurance agency office. Nonetheless, we cannot ascertain the interests and motives of Salerno or Kahn from the record. We are therefore unable to determine, as a matter of law, if Kahn was engaged in protected opposition activity. *Coville*, 73 Wn. App. at 439 (citing *Delahunty*, 66 Wn. App. at 840). Considering all facts and reasonable inferences in the light most favorable to Kahn, Hoch's conduct and language could be a violation of the law. Accordingly, Kahn's complaints constitute statutorily protected activity. 1 MARK A. ROTHSTEIN, EMPLOYMENT LAW § 3.11. Therefore, we conclude that Kahn has established specific and material facts to support this element of her retaliation claim.

B. Retaliation Was a Substantial Factor Behind Kahn's Termination

▮▮ ▮▮ Ordinarily, proof of the employer's motivation must be shown by circumstantial evidence because "the employer is not apt to announce retaliation as his motive." *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 69, 821 P.2d 18 (1991) (citations omitted). Proximity in time between the adverse action and the protected activity, coupled with evidence of satisfactory work performance

and supervisory evaluations suggests an improper motive. *Id.* Moreover, if the employee establishes that he or she participated in an opposition activity, the employer knew of the opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee that precludes us from dismissing the employee's case. *Id.* at 69; *Graves v. Department of Game*, 76 Wn. App. 705, 712, 887 P.2d 424 (1994).

Here, Kahn complained to her employer, Salerno, about Hoch's abuse. Salerno therefore had actual knowledge of Hoch's conduct. Because Kahn was discharged, a rebuttable presumption is created in her favor. Thus, we conclude that Kahn has established sufficient facts to support this element of her prima facie case.

C. The Adverse Action Was Not for Proper Cause

Salerno maintains he discharged Kahn because he was not pleased with her behavior or the quality of her work. But Kahn contends that when Salerno asked for her resignation, he did not want to discuss her·work performance. She maintains that he spoke only of the Hoch situation and her absence from work that week. Thus, Kahn contends that Salerno's proffered reasons for discharging her are pretextual.

The record supports Kahn's contentions. Salerno composed a termination memo which focuses entirely on the situation with Hoch and fails to mention Kahn's performance. Moreover, Kahn received a raise and a positive performance review only one month prior to the termination. In addition, Salerno's claim that Kahn's absence from work without permission during two workdays influenced his decision to terminate her is unconvincing because the record reflects that Kahn often worked weekends instead of normal business hours, with Salerno's approval. Further, Salerno encouraged Kahn to work nontraditional hours for the express purpose of minimizing contact between Kahn and Hoch. We therefore conclude that a reasonable trier of fact could determine that Kahn's termination was not for proper cause.

Thus, Kahn has established the existence of each element essential to her retaliation claim. *Hiatt*, 120 Wn.2d at 66. We therefore conclude that Salerno failed to prove he is entitled to judgment as a matter of law on the retaliation claim.

## III. Fraud

Kahn contends that Salerno willfully misrepresented her eligibility for the Salerno Agency's group health insurance plan for the purpose of avoiding additional expense. Accordingly, she brought a fraud action against Salerno and now maintains that the trial court erred in dismissing it. At oral argument for this appeal, Salerno explained that although he initially believed that part-time employees were not entitled to coverage under the group health insurance plan, he later realized that this was an error. Thus, it is undisputed that Kahn was entitled to coverage throughout her employment, even though she did not receive it until one month before she was terminated. Salerno nonetheless argues that the trial court properly granted summary judgment because this claim is preempted by ERISA.

The Employee Retirement Income Security Act (ERISA) is the federal law regulating employee benefit pension and welfare plans. *Cutler v. Phillips Petroleum*, 124 Wn.2d 749, 756, 881 P.2d 216 (1994), *cert. denied*, 515 U.S. 1169, 115 S. Ct. 2634, 132 L. Ed. 2d 873 (1995). ERISA contains a broad preemption provision that supersedes state laws that "relate to" employee benefit plans. 29 U.S.C. § 1144(a) ("[ERISA] shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan [covered by the statute]."). In *Cutler*, our Supreme Court explained that if the court's inquiry must be directed to an ERISA plan, then the cause of action "relates to" the ERISA plan. *Cutler*, 124 Wn.2d at 763 (holding that fraud and other common-law claims that were based on interference with attainment of benefits were preempted by ERISA).

Yet, earlier this year, both the United States Supreme Court and this court reaffirmed that the requisite

ERISA preemption analysis was changed by a 1995 United States Supreme Court case, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995). *See California Div. of Labor Standards Enforcement v. Dillingham Constr, N.A., Inc.*, 519 U.S. 316, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997); *Ironworkers Dist. Council v. Woodland Park Zoo Planning & Dev.*, 87 Wn. App. 676, 942 P.2d 1054, 1056-57 (1997). In *Travelers*, the United States Supreme Court provided the following instructions to courts interpreting ERISA's preemption clause: "We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Travelers*, 514 U.S. at 656. The Court went on to clarify that "the basic thrust of the pre-emption clause . . . was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Id.* at 657. But it reiterated that " '[p]reemption does not occur . . . if the state law has only a tenuous, remote, or peripheral connection with covered plans.' " *Id.* at 661 (quoting *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1, 113 S. Ct. 580, 121 L. Ed. 2d 513 (1992) (internal quotation marks omitted)). Moreover, we presume that ERISA does *not* supersede the historic police powers of the states unless that was the clear and manifest purpose of Congress. *Dillingham*, 117 S. Ct. at 838.

Applying this analysis to the facts of the *Travelers* case, the Court concluded that state laws regulating hospital rates, despite their indirect economic influences on ERISA plans, were not preempted by the clause. *Travelers*, 514 U.S. at 661. The Court reasoned that "there is not so much as a hint in ERISA's legislative history or anywhere else that Congress intended to squelch . . . state efforts [to regulate hospital charges]." *Id.* at 665.

In a recent case, we followed *Travelers* and applied "a holistic approach to ERISA preemption emphasizing con-

gressional intent and the purpose of ERISA." *Behavioral Sciences Inst. v. Great-West Life*, 84 Wn. App. 863, 872, 930 P.2d 933 (1997) (declining to hold that the mere mention of an ERISA plan warranted preemption) (citing *Travelers*, 514 U.S. at 656-57).

In the present case, we begin our analysis with the presumption that ERISA does not preempt Kahn's fraud claim. *Dillingham*, 117 S. Ct. at 838. Thus, the burden is on the party arguing for preemption to show, as a matter of law, that it was the clear and manifest purpose of Congress to supersede this type of common-law fraud claim. *Id.* Here, Kahn seeks damages from Salerno for the alleged fraud, but does not seek continued coverage under the group health insurance plan. In response, Salerno baldly asserts that Kahn's claim is preempted; yet, he points to no language in ERISA itself that purports to deal with the issues raised in a claim such as this one, to no legislative history that would support his position, and to no ERISA purpose that would be frustrated by Kahn's pursuit of her fraud claim in state court. In sum, Salerno has failed to address—much less overcome—the presumption that ERISA does not preempt Kahn's fraud claim. Because Salerno admitted at oral argument for this appeal that Kahn should have been given coverage, the relief sought does not require interpretation of the plan, nor does it require any action from the plan administrator.

Because the briefing on this issue is inadequate, we cannot rule as a matter of law that no purpose behind ERISA supports a preemption argument with respect to Kahn's fraud claim. But because we refuse do the research for the party with the burden of persuasion on this issue, we do conclude that Salerno has not met his burden of overcoming the presumption against preemption and is,

therefore, not entitled to summary judgment as a matter of law.[6]

## IV. Attorney Fees

Contending that Kahn's claims are frivolous, Salerno requests attorney fees on appeal under RAP 18.9. Kahn's appeal has merit. Accordingly, we deny the request.

BAKER, C.J., and ELLINGTON, J., concur.

Review denied at 136 Wn.2d 1016 (1998).

---

[6]Kahn urges us to conclude that her claim is not preempted by the ERISA statute because "hold[ing] otherwise would leave [her] with no remedy against a dishonest employer who through his subsequent termination of her (albeit on other grounds) has deprived her of any standing to pursue remedies under ERISA." Appellant's Br. at 47. Yet, our Supreme Court has explained that "[p]roviding an adequate forum for ERISA-related claims is for the Congress and not for the legislatures or courts of individual states." *Cutler,* 124 Wn.2d at 765. Thus, we reject Kahn's argument.