120 P.3d 579 (2005)
Margaret ESTEVEZ, Appellant/Cross-Respondent,
v.
The FACULTY CLUB OF the UNIVERSITY OF WASHINGTON, a Washington Corporation, and the University of Washington, Respondents/Cross-Appellants.
No. 53343-6-I.
Court of Appeals of Washington, Division 1.
March 28, 2005.
Publication Ordered October 3, 2005.
*580 Deborah Sunblad, Attorney at Law, Seattle, WA, for Appellants.
Howard Goodfriend, Deborah Brookings, Attorney at Law, Seattle WA, for Respondents.
Jeffrey Needle, Seattle, WA, Amicus Curiae.
KENNEDY, J.
¶ 1 A few weeks after being hired as the Dining Room Manager for the University of Washington Faculty Club, Margaret Estevez met Rob Layne, a kitchen employee. Soon after, Layne engaged in a series of bizarre and frightening acts directed toward Estevez. Estevez reported Layne's behavior to her supervisors; within days, Layne was placed on leave and told not to return to the Faculty Club without receiving a mental health evaluation. Layne reappeared once looking for Estevez, but was told to leave. Layne then resigned. Several days later, Estevez told her supervisors that she intended to obtain a restraining order against Layne. She was told the next day that she was being terminated from employment. She subsequently sued the Faculty Club for retaliatory termination and hostile work environment.
¶ 2 Because the Faculty Club responded promptly to Estevez's complaints, Layne's actions were not imputable to the Faculty *581 Club, and the trial court did not err in dismissing Estevez's hostile workplace claim. However, Estevez provided sufficient evidence to support both a prima facie claim of retaliatory termination and pretext. Thus, her claim for retaliatory termination was improperly dismissed.

FACTS

Estevez's Allegations
¶ 3 Estevez interviewed for the position of Faculty Club Dining Room Manager and was hired by the Club Manager, Colleen Rohrbaugh, on September 17, 2001. Her immediate supervisor was the Catering Manager, Alexandra Chordas. A few weeks after being hired, Estevez met Rob Layne, a kitchen employee. Greg Fazzini, the Kitchen Manager/Chef, and Mike Hoffman, another kitchen employee, noted that Layne, a normally quiet and shy person, seemed to be a bit "chattier" with Estevez. They both told Estevez that Layne was looking for new friends, and encouraged Estevez to make friends with Layne.
¶ 4 Soon after Estevez met Layne, he asked her out for a drink. She told him that she was married, and declined his offer. A few days later Estevez's husband met Layne. Estevez and her husband planned to go to a gun show on October 7, 2001, to add to the husband's military memorabilia collection. They asked Layne to attend the show with them. Layne agreed, and they made arrangements for him to come to their home at 8 a.m. on the morning of the gun show.
¶ 5 On the morning of the show, Layne showed up around 7:20 a.m., and told Estevez that he had stayed up until midnight the night before so that he would not be late. He showed Estevez and her husband a notebook in which he had written while waiting to come over; the notebook contained the names of Estevez, her husband, and their son, and their address, written over and over. Estevez stated that the notebook also contained a statement or pledge that Layne "would fight no longer." Estevez tried to make light of the notebook, and the three went to the gun show. Layne spent much of the time outside the show, and he rambled in a disjointed way, during the ride home. The next day, Layne called Estevez at home to tell her what a great time he had had.
¶ 6 Estevez reported Layne's strange behavior to Rohrbaugh when she returned to work on October 9, 2001. Thereafter, Layne attempted to give Estevez a plant, all his expired driver's licenses and work permits dating back to the 1980's, a ski cap, ski goggles, lotion, and some sort of toy. When Estevez refused the gifts with the exception of the plant, Layne became agitated. She later found the expired licenses and work permits in a bag with the plant and the other items in a common locker at work.
¶ 7 Estevez gave these items to Rohrbaugh on October 10, and told her that she was "becoming fearful" and believed that Layne was "stalking" her. Estevez said that Rohrbaugh told her not to worry, that Layne would soon be on paid leave. Layne thereafter asked to speak to Estevez alone, in the walk-in refrigerator. Estevez asked another employee, Mike Hofmann, to stand with her outside the refrigerator. Layne told Estevez that he had added her name to his credit card accounts. When Estevez refused to accept this, Layne became angry. Estevez reported the incident to Rohrbaugh, and was told that Layne would be gone by the end of the day.
¶ 8 When Estevez returned to work on October 11, 2001, she said she was told that "everything was in hand" and that she did not have to worry anymore. When Estevez told Chordas that she was still fearful because Layne seemed to be obsessed with her, Chordas responded, "no, fixated." When Estevez returned home that day, Layne called her there. She did not pick up the phone, and Layne left a message that he was off work for a couple of weeks, that he had stopped by work to give her a ride, and that he wanted to know where she was.
¶ 9 Estevez told Rohrbaugh about the call when she returned to work on October 12, and told Rohrbaugh that she had an intense fear of Layne. Later that day, Layne showed up at the Faculty Club and sought out Estevez, telling her that he had come to visit since she had not returned his call. Estevez ran to tell Rohrbaugh, and both *582 Rohrbaugh and Chordas went to confront Layne. Rohrbaugh called the UW police, and a report was made. Chordas drove Estevez home and told her not to come to work the following day because Chordas and Rohrbaugh feared that Layne might return to work looking for Estevez again, and a big event was planned at the Faculty Club.
¶ 10 When Estevez got home the evening of October 12, she found a "desperate" message from Layne. Her caller I.D. showed that he had called her home multiple times. Fearing that Layne would come over if she did not call him, Estevez returned his call. She stated that he rambled, laughed inappropriately, and made obsessive comments such as "we have to be together"; "I want to spend all of my time off with you"; "I only want to see you, no one else"; and "we already are together." Estevez told Layne that they were strangers to each other and, when she continued to resist his comments, he said, "Fine, you want to believe THEM, be like THEM, well I'll be seeing you around! and hung up." Clerk's Papers at 257-58.
¶ 11 Estevez immediately called Rohrbaugh at home; she also called the UW police. She learned from the police that Layne had told them that she and he were engaged to be married. Seattle police came to Estevez' home around 2 a.m. and advised Estevez and her husband to stay at home with their son the next day, with the blinds closed. If Layne appeared, they were told to call the Seattle Police. They followed these instructions, but Layne did not come to the Estevez home.
¶ 12 Estevez had previously asked Rohrbaugh for assistance in getting the UW "Night Ride" shuttle service to take her to her bus stop so that she would not have to walk alone across campus every night after work. Estevez was not able to use the Night Ride service without such assistance because she had not yet received her employee U-Pass. Because Layne knew where she lived and knew the bus routes, Estevez also planned to have her husband meet her at the bus stop, and walk her home. When Estevez returned to work on October 16th, she learned that no calls had been made on her behalf. Rohrbaugh told her to call the Night Ride service herself. Estevez tried, but could not get anyone on the phone. When she told Chordas that she was upset by this, Chordas responded that there was no rational reason to believe that Layne would bother her again. Chordas suggested that if she were worried, Estevez's husband could escort her home.
¶ 13 The UW Police had suggested that Estevez get a restraining order against Layne, and also suggested that the Faculty Club should help pay for it. However, when Estevez approached Chordas and Rohrbaugh about this option on October 16, Rohrbaugh told her that it would be a "waste of money" because Layne had not contacted her in four days. Later that same day, Chordas told Estevez that Fazzini planned to bring Layne back to work, and that a restraining order would create a "conflict of interest." When Estevez came to work on October 17, she again was not given any assistance in obtaining her U-Pass or Night Ride Service. Rohrbaugh told her that she should not be fearful since Layne had not contacted her in five days, repeated that a restraining order was a waste of money, and told her that she had heard from Layne's roommates that he was out camping. Estevez told both Rohrbaugh and Chordas that she intended to get a restraining order.
¶ 14 When Estevez returned to work on October 19, Chordas and Rohrbaugh told her that her employment was being terminated because she had been extremely "stressed out" lately and that this "stressful vibe" was interfering with her staff's ability to do their work. When Estevez informed them this was because of Layne's stalking, Chordas acknowledged the "Rob incident" but stated that they felt that Estevez's stress was normal to her, and that she was not a "people person." Estevez asked for two more weeks to prove her abilities. She was told that no one doubted her abilities, but that she was just not a "good fit." However, they said that they would give her an additional two weeks to "prove" that she could be less stressed, and that she would be starting with a "clean slate."
*583 ¶ 15 But the next day, Chordas told Estevez that she should start looking for another job right away. When Estevez asked for specific examples of how her stress had caused problems with any event or staff members, Chordas became annoyed and told her that she simply was not a "good fit" for the Faculty Club. Estevez continued to work at the Faculty Club for two weeks without incident or feedback about how she was doing. Estevez was given a termination letter on October 30, 2001. Rohrbaugh told her that she would give her a wonderful reference, and subsequently gave her a letter of reference stating that she was "capable, efficient, and responsible." Estevez thereafter obtained a restraining order against Layne.
¶ 16 Estevez declared that at no point prior to her termination was she ever told that her work performance was not satisfactory. She was never disciplined, and was never counseled for inappropriate conduct. Chordas complimented her several times about how well she did her job, and about how Chordas kept forgetting that Estevez had not been employed at the Faculty Club for a long time because she was doing her job so well. Estevez asserted that Chordas even asked her if she would be interested in taking over her job duties, if Chordas were ever promoted when Rohrbaugh retired.
¶ 17 Estevez stated that after beginning employment, she went to Rohrbaugh and Chordas multiple times with ideas on how to make the staff stronger, and that she was told her input was appreciated. Estevez held a meeting with her staff to outline her expectations on October 11, 2001. Chordas attended the meeting. She and Rohrbaugh had earlier approved a handout that Estevez had prepared for the meeting. Both Rohrbaugh and Chordas later admitted that there was nothing inappropriate about the meeting or the handout. Estevez also declared that she was given no specific incidents of misconduct or inappropriate behavior when she was terminated, other than her "stressful vibe."
¶ 18 Estevez sued the Faculty Club under both Title VII and Ch. 49.60 RCW, claiming that she had been subjected to a hostile work environment and that she had been discharged in retaliation for complaining about unlawful sexual harassment.

Faculty Club's Evidence
¶ 19 The Faculty Club moved for summary judgment, asserting that it had promptly and appropriately responded to Layne's behavior, and that Chordas and Rohrbaugh fired Estevez for her poor work performance, not because of her complaints about Layne. Colleen Rohrbaugh declared that she hired Layne in September of 1995, and that generally he was quiet and reclusive. She described two incidents that occurred before the trouble arose regarding Estevez.[1] Rohrbaugh learned from Fazzini on October 8, 2001, that Layne had been telling co-workers that he was engaged to Estevez, although he knew Estevez was married. Rohrbaugh immediately telephoned Ron Boerger from UW Human Resources and made an appointment to meet with him and other workplace safety specialists. A few days later, after Estevez reported Layne's strange behavior at the gun show, his gifts, and her concern over Layne's actions, Rohrbaugh met with Boerger and the UW Police, and decided that Layne should undergo a mental health evaluation before returning to work. The primary topic of discussion was how to get help for Layne.
¶ 20 Rohrbaugh began drafting a letter to Layne on October 10, which she and Chordas gave to Layne on October 11. The letter informed Layne that he was being placed on administrative leave, and that he needed to obtain a mental health evaluation before returning to work. Rohrbaugh stated that she told Layne that he needed to stay away from the Club, and that Layne agreed. Rohrbaugh did not feel that she needed to give Layne a Notice of Criminal Trespass because he had always followed the rules. She did *584 not discuss with Layne the incidents involving Estevez.
¶ 21 When Layne showed up at work on October 12, looking for Estevez, Rohrbaugh told him to leave immediately, and he did so. She also gave Estevez her home number, and found her a ride home. Rohrbaugh received a resignation note from Layne dated October 14, a few days prior to Estevez's first request for assistance in getting a protection order. Rohrbaugh stated that at no time did she receive any reports that Layne had touched Estevez, propositioned her for sex, or made any inappropriate sexual remarks to her, about her, or in front of her. Rohrbaugh affirmed that Estevez had reported Layne's behavior to her when it happened, including the calls that Layne made to Estevez's home. She admitted Layne appeared to be attracted to Estevez. However, she stated that she believed Estevez was "overreacting" to the situation, and admitted that she did not ask the Night Ride service to make an exception for Estevez.
¶ 22 Rohrbaugh asserted that Estevez's complaints about Layne had nothing to do with her decision to terminate her. She stated that during the first two weeks of Estevez's employment, both Chordas and Fazzini reported a number of incidents involving Estevez, and complained that they were having difficulty working with Estevez. Rohrbaugh said that during a brunch event on October 6, she heard Estevez screaming and using profanity while talking with Chordas, and that she later heard Estevez using profanity in the dining room with the student wait-staff she supervised. Rohrbaugh asked Chordas to speak to Estevez about it. Rohrbaugh stated that she met with Chordas and Fazzini on October 18, and that both Chordas and Fazzini said that Estevez was difficult to work with, became agitated frequently, and that her language was frequently inappropriate. They all agreed that Estevez's personality and management style were not a good fit for the Club.
¶ 23 Alexandra Chordas admitted that Layne's behavior toward Estevez was inappropriate, but similarly declared that the fact that Estevez complained about Layne had nothing to do with her concurrence in Estevez's termination. She stated that on September 27 she had to mediate an argument between Estevez and a front office employee, which Chordas believed Estevez escalated by yelling at the employee rather than trying to resolve the matter. Chordas said that on October 6, a number of student servers called in sick for an event; Estevez again reacted angrily, became loud and confrontational with Chordas, used profanity, and that this increased, rather than decreased, the stress of the situation. Chordas said that she reported both incidents to Rohrbaugh, but that they did not discuss disciplining Estevez.
¶ 24 Chordas stated that within a few days, she again had to mediate between Estevez and a student server whom Estevez believed was being insubordinate. Chordas said that Estevez again escalated the situation rather than trying to resolve it. Finally, Chordas declared that on October 12, Estevez angrily confronted her in the main entrance hall of the Faculty Club and accused Chordas of not properly training her. Chordas informed Rohrbaugh of the incident. Chordas declared that by October 18, she believed that Estevez was not a "good fit" for the Club and that her personality was such that Chordas had difficulty working with her. Chordas admitted that she never made any notes in Estevez's personnel file about these incidents.
¶ 25 The Faculty Club submitted additional declarations from several workers. Greg Fazzini, the Faculty Club chef, declared that within the first two weeks of Estevez's hiring in September 2001, she shared a vulgar story with him and other staff about one of her previous sex partners; he reported the incident to Rohrbaugh. He stated that by October 18 he had come to the conclusion that Estevez was not someone he wanted to work with because she was coarse, and that he communicated this opinion to Chordas and Rohrbaugh. Mike Hoffman, a cook at the Faculty Club, declared that he worked with Estevez to handle between ten and twenty events. He stated that he had difficulty working with her because she gave him little information about food needs and that she frequently used profanity in the open area *585 between the kitchen and dining room. Dan Hard, another cook for the Faculty Club, stated that he did not believe Estevez treated her waitstaff with respect. All three of these employees confirmed the drastic change in Layne's behavior during the time Estevez was employed.[2]

Estevez's Response
¶ 26 When confronted with these allegations about her work behavior, Estevez admitted that near the end of September 2001, an employee angrily confronted her on the floor of the Club, and that she tried to move him to a less public area. Estevez admitted that she eventually responded with profanity, but that no other employees or patrons were within earshot. Estevez also admitted that early in October 2001, she had problems with returning student servers who were insubordinate and refused to work. She stated that she approached Chordas about these problems, and that several students later called in sick during a busy event, leaving the Faculty Club short-staffed. She stated that she was frustrated by this and vented privately to Chordas that the servers should be fired, but that no employees were in earshot, she did not raise her voice and Chordas agreed there was a problem with these students. Estevez stated that neither Chordas nor Rohrbaugh disciplined or counseled her about either incident.
¶ 27 Regarding the claimed use of profanity, Estevez stated that it was not unusual for kitchen employees to use profanity, particularly when things were busy. Estevez admitted that she also used profanity at work when under pressure, but never in front of customers or to subordinate employees. She denied telling the vulgar story about a previous sex partner.
¶ 28 Estevez also provided the declaration of Terry Strohschein, who was previously employed as a server at the Faculty Club. Strohschein declared that he worked with Estevez nearly every shift he worked. He often interacted with kitchen staff, and stated that it was not unusual for kitchen employees, even Fazzini, to use profanity when things were busy. Strohschein stated that on many occasions he heard both Fazzini and Hofmann use profanity when talking about Estevez, and that they called her names behind her back and said rude things about her. Strohschein stated that although there was a lot of talk of a sexual nature both among the serving staff and the kitchen staff, he never heard Estevez make any sexual jokes or talk about sexual things. He stated Estevez was very professional, and that she was not offensive to her wait staff.
¶ 29 Strohschein also stated that although he did not work with or know Layne, he was aware that Estevez was frightened by Layne's actions. He stated that on one occasion, Chordas asked him to escort her to her car because she, too, was frightened of Layne. Strohschein declared that around the time that Estevez was terminated, he heard Rohrbaugh talking with Chordas and other employees about Estevez, calling her a "piece of work." He said that after Estevez was terminated he was contacted by the EEOC. When he informed Rohrbaugh about this, he said she told him to "remember who I worked for" and said that Estevez was a "troublemaker."
¶ 30 The trial court granted the Faculty Club's motion for summary judgment, dismissing Estevez's claims of retaliatory termination and hostile work environment with prejudice. Estevez appeals, asserting that triable issues of fact preclude summary judgment.

DISCUSSION
¶ 31 We apply the usual de novo standard of review to summary judgments. Kahn v. Salerno, 90 Wash.App. 110, 117, 951 P.2d 321 (1998). All facts and reasonable inferences are considered in a light most favorable to the non-moving party. Kahn, 90 Wash.App. at 117, 951 P.2d 321. Summary judgment should only be upheld if no genuine issues of material fact are present. The burden is on the moving party to establish its right to *586 summary judgment as a matter of law. CR 56; Kahn, 90 Wash.App. at 117, 951 P.2d 321.
¶ 32 Hostile workplace and retaliatory termination claims based on sexual harassment or discrimination are recognized by both Title VII and RCW 49.60 et seq. See, e.g., Nichols v. Azteca Restaurant Enter., Inc., 256 F.3d 864 (9th Cir.2001); Kahn, 90 Wash.App. 110, 951 P.2d 321.

I. "Private Club" Exemption under Title VII

¶ 33 As a preliminary matter, the Faculty Club first asserts that it is immune from Estevez's Title VII claims because it is a "private club" under 42 U.S.C.2000e(b), which provides in part:
The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include ... a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26[.]
¶ 34 The Faculty Club provided a letter to the trial court from the Internal Revenue Service stating that it was exempt from federal income tax pursuant to Section 501(c). Thus, the issue on appeal is whether the Faculty Club has proven that it is a "bona fide private membership club." Quijano v. Univ. Fed. Credit Union, 617 F.2d 129, 130-31 (5th Cir.1980).
¶ 35 The Quijano court articulated three criteria that must be met in order for an organization to achieve private membership club status and thus to be exempt from suit under Title VII:(1) the organization must be a club in the "ordinary sense of the word" and its purposes and objectives must also be legitimate and not a sham; (2) the organization must be private as opposed to public; and (3) the organization must require some "meaningful conditions of limited membership."[3]Quijano, 617 F.2d at 131. See also E.E.O.C. v. Chicago Club, 86 F.3d 1423, 1435 (7th Cir.1996). Estevez does not contest that the Faculty Club is a "club" in the ordinary sense of the word, and does not argue at all that the Club is not "private." Rather, she asserts that the Club cannot show any meaningful conditions of limited membership.
¶ 36 "[S]elective membership practices are the essence of private clubs." Chicago Club, 86 F.3d at 1436. "To meet the requirement of meaningful conditions of limited membership, defendant must show that it limits its membership by restricting the size of its total membership and by according membership only to individuals found personally accepted by its members." Kelsey v. Univ. Club of Orlando, Inc., 845 F.Supp. 1526, 1530 (M.D.Fla.1994), citing EEOC Dec. No. 85-2, 36 Fair Empl. Prac. Cas. (BNA) 1893, EEOC Dec. P 6844, 1984 WL 23401 (1984).
¶ 37 In Chicago Club, the Club's bylaws authorized a total of 1,450 members, excluding senior members. The membership was split into twelve separate classes and several subclasses of memberships and special classifications for federal or foreign government employees and for surviving spouses of deceased members. Chicago Club, 86 F.3d at 1426. Nevertheless, the court found that the "procedural gauntlet" of a rigorous screening process for prospective candidates, which emphasized personal interaction between members and candidates for membership, a requirement that the candidates be of "of good standing" or sound moral character, and which led to the admission of a select group of professionals, was sufficient to illustrate that meaningful conditions of limited membership existed. Chicago Club, 86 F.3d at 1426-27, 1437.
¶ 38 The court in Kelsey similarly determined that sufficient meaningful conditions of membership existed at the University Club of Orlando, where the Club limited its total membership to 700 members, informed *587 its members of persons applying for membership before voting, and required sponsoring members to confirm that an applicant met membership qualifications, to provide a basis for their knowledge of the applicant and the applicant's suitability for membership, including character, reputation, and financial responsibility. Kelsey, 845 F.Supp. at 1531.
¶ 39 Here, the Faculty Club's Bylaws provides for seven classes of membership. Active membership is restricted to faculty members, "professional librarians, administrative officers and other non-academic members of the staff of the University whose work is considered to be essentially on a professional level." The Club also offers Honorary, Retired, Special, Guest, Reciprocal, and Alumni memberships. Clerk's Papers at 13-14, Article III, § 1 a-g. Only Honorary members pay no dues, while Reciprocal members may pay reduced dues if their stays exceed a continuous four-week period. The only difference in membership privileges is that Active members may vote, while the other classes may not. The bylaws provide for the election of a board of nine Trustees, each to serve three years and three to be elected each year. A Membership Committee is specified as a standing committee and is "responsible for membership recruitment and retention, and for interpreting membership qualifications." Clerk's Papers at 15-16, Article V; Article VI, § 3.
¶ 40 However, no limitation on the size of membership is provided by the Faculty Club bylaws. The bylaws contain absolutely no screening process for membership, with the exception of Special members and the visiting professional personnel category of Guest members, both of whom must be recommended by Active members of the Board of Trustees and approved by at least five Trustees. There is no requirement for good moral character or similar qualification, except for Reciprocal members who must be in "good standing" at faculty clubs at other institutions.[4]
¶ 41 These conditions of membership to the Faculty Club are not limited, but are extremely broad. Membership is not limited in size. Further, most members have no screening process at all and only a limited screening process is required for a limited number of non-active members. Thus, we hold that the Club does not have "meaningful conditions of limited membership" sufficient to qualify it for a "bona fide private club" exemption under 42 U.S.C.2000e(b)(2). The Faculty Club is not exempt from Estevez's Title VII claims.

II. Hostile Work Environment

¶ 42 Estevez argues that the trial court erred in dismissing her claim of hostile work environment under both Title VII and RCW 49.60 et seq. Because RCW 49.60 substantially parallels Title VII, federal cases interpreting Title VII are "persuasive authority for the construction of RCW 49.60." Oliver v. Pac. Northwest Bell Tel. Co., 106 Wash.2d 675, 678, 724 P.2d 1003 (1986).
¶ 43 RCW 49.60.180(3) provides, in relevant part:
It is an unfair practice for any employer ... [t]o discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability[.]
¶ 44 Similarly, under Title VII, it is unlawful for an employer "to discriminate *588 against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of ... sex." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment in the form of a hostile work environment constitutes sex discrimination. Nichols, 256 F.3d at 871 (citations omitted); Kahn, 90 Wash.App. at 116-18, 951 P.2d 321.
¶ 45 To establish a hostile work environment sexual harassment case under RCW 49.60, Estevez must prove: (1) the harassment was unwelcome; (2) the harassment was because of sex; (3) the harassment "affected the terms or conditions of employment;" and (4) the harassment is imputed to the employer. Coville v. Cobarc Serv., Inc., 73 Wash.App. 433, 438, 869 P.2d 1103 (1994) (citations omitted). See also Glasgow v. Georgia-Pacific Corp., 103 Wash.2d 401, 406-07, 693 P.2d 708 (1985). To establish a federal claim under Title VII, Estevez must show that: (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was "sufficiently severe or pervasive to alter the conditions of victim's employment and create an abusive working environment[.]" Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1527 (9th Cir.1995) (citations omitted).
¶ 46 The Faculty Club does not contest that the harassment was sexual in nature or that it was unwelcome. Rather, the Faculty Club asserts that Estevez's claims fail because Layne's behavior was not sufficiently severe or pervasive enough to alter Estevez's conditions of employment and also because Layne's actions cannot be imputed to the Club because they promptly took correct action. Whether or not the harassing conduct affected the terms and conditions of Estevez's employment, and there is strong evidence that it did even though it was short in duration, we agree with the Faculty Club that Layne's harassing conduct cannot be imputed to them.
¶ 47 To impute liability to an employer for a co-worker's actions in a hostile workplace claim pursuant to RCW 49.60 et seq., the plaintiff has the burden of proving that the employer "`(a) authorized, knew, or should have known of the harassment, and (b) failed to take reasonably prompt and adequate corrective action.'" Herried v. Pierce County Public Transp. Benefit Auth. Corp., 90 Wash.App. 468, 474, 957 P.2d 767 (1998) (quoting Glasgow, 103 Wash.2d at 407, 693 P.2d 708). This element may be proven by showing "`that the employer's remedial action was not of such nature as to have been reasonably calculated to end the harassment.'" Herried, 90 Wash.App. at 474, 957 P.2d 767 (quoting Glasgow, 103 Wash.2d at 407, 693 P.2d 708). Similarly, an employer is not liable for a hostile working environment under Title VII unless it fails to remedy harassment of which it knows or should know. Fuller, 47 F.3d at 1527, citing Ellison v. Brady, 924 F.2d 872, 881 (9th Cir.1991).
¶ 48 In Herried, a plaintiff complained to her employer of three discrete incidents of misconduct spanning several years: that the co-worker shirked work, brushed up against her during work, and then blocked her path in a hallway. The plaintiff later claimed that these three incidents created a hostile work environment. Herried, 90 Wash.App. at 471-72, 957 P.2d 767. However, the court found that the plaintiff had failed to impute liability to the employer because when the plaintiff complained about each incident, the employer took immediate remedial action by hiring mediators, outlining "expectations" for all co-workers, demoting the complained of co-worker, and removing him from the department. Herried, 90 Wash.App. at 474-75, 957 P.2d 767. Thus, the employer's immediate response to each of the complaints illustrated that it took reasonably prompt and adequate corrective action.
¶ 49 Here, a similar situation is presented. The Faculty Club admits it knew of Layne's odd behavior and admits that Estevez reported the incidents to Rohrbaugh and Chordas. Nevertheless, prompt remedial action was taken in response to each incident. On October 8, 2001, even before Estevez first reported Layne's strange behavior at the gun show, Rohrbaugh learned that Layne was telling co-workers that he was engaged to Estevez. Rohrbaugh immediately telephoned Ron Boerger from UW Human Resources and made an appointment to meet with him and other workplace safety specialists. After Estevez reported Layne's strange behavior at *589 the gun show, Rohrbaugh met with Boerger and the UW Police, and decided that Layne should undergo a mental health evaluation before returning to work. When Estevez returned to work on October 10, gave Layne's "gifts" to Rohrbaugh, and told her that she believed that Layne was "stalking" her, Rohrbaugh told her that Layne would be gone the next day.
¶ 50 The next day, Rohrbaugh and Chordas placed Layne on administrative leave, informed him that he needed to obtain a mental health evaluation before returning to work, and told him that he needed to stay away from the Club. When Layne showed up at work on October 12 looking for Estevez, Rohrbaugh immediately told Layne to leave, and called the UW Police. Chordas drove Estevez home, and Rohrbaugh gave Estevez her home phone number. Thus, Rohrbaugh promptly and appropriately responded to every work incident as soon as she learned of it.
¶ 51 Estevez asserts that the corrective action was not adequate because Rohrbaugh did not issue a Notice of Trespass to Layne or even specifically discuss the incidents involving Estevez when she placed him on leave. Still, Layne was removed from the workplace within days of Estevez's first complaint. Although her supervisors discouraged Estevez from obtaining a restraining order, by this time Layne had resigned, and he had not contacted Estevez in four days. Insofar as we can determine from the record, Layne never contacted Estevez again, although at least two weeks passed before Estevez obtained a restraining order.
¶ 52 An employer is required only to take "reasonably prompt and adequate corrective action." Herried, 90 Wash.App. at 474, 957 P.2d 767 (citations omitted). There is no requirement that employers take all possible measures of corrective action. Even viewing the evidence in a light most favorable to Estevez, the Faculty Club's corrective actions were both reasonably prompt and adequate. On these facts, the actions of Layne cannot be imputed to the Faculty Club. Thus, the trial court did not err in granting the Club's summary judgment motion on Estevez's hostile workplace claims.

III. Retaliatory Discharge

¶ 53 Estevez next asserts that the trial court erred in dismissing on summary judgment Estevez's claim of retaliatory discharge for complaining about unlawful sexual harassment under both Title VII and RCW 49.60 et seq.
¶ 54 RCW 49.60.210(1) provides in relevant part:
It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.
Title VII of the of the Civil Rights Act of 1964 provides in relevant part:
It shall be an unlawful employment practice for an employer... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]
42 U.S.C.A. § 2000e-2(a)(1).
¶ 55 To establish a prima facie case of retaliation for a protected activity under either RCW 49.60 or Title VII, an employee must show that (1) he or she engaged in statutorily protected activity; (2) an adverse employment action was taken; and (3) there was a causal link between the employee's activity and the employer's adverse action. Delahunty v. Cahoon, 66 Wash.App. 829, 839, 832 P.2d 1378 (1992) (citations omitted); Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir.1987).
¶ 56 If Estevez establishes a prima facie case, then the Faculty Club may attempt to rebut the case by presenting evidence of a legitimate non-discriminatory reason for the employment decision. The burden then shifts back to Estevez, who can attempt to prove that the employer's reason is pretextual. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 180-81, 23 P.3d 440 (2001) (noting that Washington courts have adopted the *590 burden-shifting proof mechanism of federal courts outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 70, 821 P.2d 18 (1991). Once evidence supporting a prima facie case, a non-discriminatory explanation, and pretext has been presented and "the record contains reasonable but competing inferences of both discrimination and nondiscrimination, `it is the jury's task to choose between such inferences.'" Hill, 144 Wash.2d at 186, 23 P.3d 440, citing Carle v. McChord Credit Union, 65 Wash.App. 93, 102, 827 P.2d 1070 (1992) (other citations omitted).
¶ 57 There is no question that an adverse employment decision was taken: Estevez was terminated. To show that she engaged a "statutorily protected activity" Estevez need only prove that her complaints went to conduct that was at least arguably a violation of the law, not that her opposition activity was to behavior that would actually violate the law against discrimination. Kahn, 90 Wash.App. at 130, 951 P.2d 321. "`To determine whether an employee was engaged in protected opposition activity, the court must balance the setting in which the activity arose and the interests and motives of the employer and employee.'" Kahn, 90 Wash.App. at 130, 951 P.2d 321 (quoting Coville, 73 Wash.App. at 439, 869 P.2d 1103). See also Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir.2002) (citations omitted) (opposition activity is protected under Title VII when it is based on a reasonable belief that the employer has engaged in an unlawful employment practice).
¶ 58 Here, the facts show that Layne had either a romantic or sexual interest in Estevez, as indicated by his fixation with her, his telling co-workers and police that he and she were engaged, his insistence on giving her gifts at work, putting her name on his credit cards, and coming to work, very agitated, to see Estevez, because she did not return his calls. When viewed in a light most favorable to the plaintiff, these comments and actions of a romantic or sexual nature could be seen as a violation of RCW 49.60 et seq. Therefore, Estevez's complaints about such comments and actions constituted protected statutory activity. Kahn, 90 Wash.App. at 130, 951 P.2d 321 (comments by coworker involving sexual vulgarities, staring at plaintiff's breasts, and mannerisms with "sexual overtones" could be considered by plaintiff to be violation of law).
¶ 59 "Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose." Vasquez, 94 Wash.App. at 985, 974 P.2d 348, citing Kahn, 90 Wash.App. at 130, 951 P.2d 321. Proximity in time between the discharge and the protected activity, as well as satisfactory work performance and evaluations prior to the discharge, are both factors that suggest retaliatory motivation. Vasquez v. State, Dep't of Soc. & Health Serv., 94 Wash.App. 976, 985, 974 P.2d 348 (1999), citing Kahn, 90 Wash.App. at 130-31, 951 P.2d 321. "Moreover, if the employee establishes that he or she participated in an opposition activity, the employer knew of the opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee that precludes us from dismissing the employee's case." Vasquez v. State, Dep't of Soc. & Health Serv., 94 Wash.App. 976, 985, 974 P.2d 348 (1999), quoting Kahn, 90 Wash.App. at 131, 951 P.2d 321, citing Wilmot, 118 Wash.2d at 69, 821 P.2d 18; Graves v. Department of Game, 76 Wash.App. 705, 712, 887 P.2d 424 (1994). See also Yartzoff, 809 F.2d at 1376 (causation sufficient to establish third element of prima facie case may be inferred from the employer's knowledge that the employee engaged in protected activity and the proximity in time between the protected action and the allegedly retaliatory employment decision).
¶ 60 Here, there was a close proximity in time between Estevez's initial complaints and her termination. She first told Rohrbaugh that she believed Layne was "stalking" her, on October 10, 2001. She continued to complain about Layne's attentions for several days; her supervisors knew that she was fearful. After Layne appeared at work looking for Estevez, after he had been placed on leave and told by Rohrbaugh to stay away *591 from the Faculty Club, Estevez repeatedly requested assistance in obtaining a restraining order and assistance in obtaining "Night Ride" services. Estevez was terminated on October 19, only nine days after reporting that she believed Layne was "stalking" her, and on the day after she told Rohrbaugh and Chordas that she intended to obtain a restraining order. Estevez had already provided evidence that her complaints were protected, that the employer knew about her complaints, and that she was terminated. Thus she had established a rebuttable presumption in her favor of a prima facie case of discrimination.
¶ 61 Nevertheless, the Faculty Club asserts that Estevez was terminated for vulgar language, her inability to handle anger directed toward co-workers and subordinates, and her inability to work well with her staff and other co-workers. These are legitimate non-discriminatory reasons for Estevez's termination. Thus, Estevez must show that these reasons were pretextual.
¶ 62 At the summary judgment stage of pretext, Estevez must provide evidence that supports an inference that her complaints about Layne were a "substantial factor" motivating the employment decision. Allison v. Housing Authority, 118 Wash.2d 79, 84, 95-97, 821 P.2d 34 (1991). See also Desert Palace, Inc. v. Costa, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (citing 42 U.S.C. § 2000e-2(m) (claimant need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice.")). An employee may prove the employer's reasons were pretextual "`either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220, 80 Fair Empl. Prac. Cas. (BNA) 890 (9th Cir.1998), quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). When the plaintiff offers direct evidence of discriminatory motive in a Title VII claim, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." Godwin, 150 F.3d at 1221.
¶ 63 Estevez has presented both direct and indirect evidence of pretext. First, she presents direct evidence that Rohrbaugh and Chordas told her they were firing her for being "stressed out" and that they acknowledged that this stress, in part, was attributable to the incidents involving Layne. Rohrbaugh and Chordas also initially agreed to allow Estevez two weeks to show that the stress from the Layne situation would not affect her employment, but withdrew that option the next day. This evidence is sufficient to show that the incidents involving Layne were at least a "motivating factor" in the employment decision sufficient to support pretext for a Title VII claim. Moreover, even if standing alone the evidence might not show that that a discriminatory reason was a "substantial factor" in the decision as required by RCW 49.60, Estevez also provided additional circumstantial evidence that the Faculty Club's proffered explanations were "unworthy of credence."
¶ 64 Prior to her termination, Estevez received only positive feedback and was not reprimanded or disciplined. The Faculty Club initially failed to provide Estevez with any other reasons for termination other than her "stressful vibe" and their opinion that she was not a "good fit." Rohrbaugh and Chordas did not describe to her the other incidents they now claim motivated their decision. They admit that they made no notes of these incidents, and they do not provide any written performance evaluations or other evidence of the claimed prior disciplinary conduct. Estevez also provides facially reasonable explanations for the various incidents of improper conduct that the Faculty Club claims motivated their decision to terminate her. Further, Terry Strohschein, a co-worker who worked directly with Estevez multiple times, declared that he never heard Estevez make sexual jokes and found her to be very professional. Strohschein also asserted that after Estevez was terminated and he was contacted by the EEOC, Rohrbaugh told him to "remember who he worked for" and referred to Estevez as a "troublemaker."
*592 ¶ 65 This case is different from the situation presented in Kuyper v. State, 79 Wash.App. 732, 904 P.2d 793 (1995), a case cited by the Faculty Club. In that case, the plaintiff argued gender and age discrimination in the employer's decision to hire a younger male employee for the Department of Wildlife's Region 4 Coordinator position rather than her. Kuyper, 79 Wash.App. at 734-35, 904 P.2d 793. The Kuyper court found that the plaintiff's evidence that she was qualified, that only men had previously been hired for coordinator positions, and that she had assumed 80 percent of the duties for Region 4 for ten years, and a declaration from a supervisor that he was later instructed to hire a woman because of "what happened" in Region 4, were insufficient to show pretext. Kuyper, 79 Wash.App. at 736-37, 904 P.2d 793.
¶ 66 The evidence provided here is of a different nature. Estevez was told that she was being terminated for her "stressful vibe" after her complaints about Layne. Her supervisors acknowledged that the stress was caused in part by the co-worker she complained about. They provided her with no other reasons for her termination, and their later explanations were convincingly explained by Estevez. Cf. Little, 301 F.3d at 970-71 (plaintiff presented sufficient evidence that reasons for termination after report of rape by client were pretextual where she had received only years of positive feedback prior to her payout and termination). When viewed in a light most favorable to Estevez, this evidence supports a reasonable inference that the explanations given for Estevez's termination were pretextual, and that a substantial factor in Estevez's termination was her complaints about Layne.
¶ 67 The Faculty Club also argues that even if this court assumes that the "stressful vibe" was based entirely on Estevez's reactions to the incident with Layne, Estevez has shown that the incident so interfered with her job that it rendered her ineffectual and thus she is not protected by RCW 49.60, citing Selberg v. United Pac. Ins. Co., 45 Wash.App. 469, 472, 726 P.2d 468 (1986), abrogated in part on other grounds, Allison v. Housing Auth., 59 Wash.App. 624, 799 P.2d 1195 (1990). But the Selberg court held that protest conduct directed toward unlawful activity may so interfere with an employee's work performance and render the employee ineffectual in employment so as to afford an independent non-discriminatory basis for termination. Selberg, 45 Wash.App. at 472, 726 P.2d 468. Selberg did not hold that an employee's understandable stress in reacting to sexual harassment at work would justify termination. We decline to adopt any such rule.
¶ 68 Finally, the Faculty Club asserts that Estevez was fired during her probationary period and cites Samuels v. City of Lake Stevens, 50 Wash.App. 475, 749 P.2d 187 (1988) for the proposition that the probationary period allows an employer to evaluate the employee and discharge him or her during this period if the employee's performance is unsatisfactory. Samuels involved the question of whether a probationary employee was entitled to an investigation or hearing concerning his discharge under civil service rules, and whether he had a property interest in continued employment that could be a basis of a federal civil rights claim. Samuels, 50 Wash.App. at 478-81, 749 P.2d 187. No case allows a discriminatory termination merely because an employee is probationary, rather than permanent. Probationary employees are not subject to a different standard in employment discrimination claims from non-probationary employees.
¶ 69 In sum, when viewed in a light most favorable to Estevez, the evidence supports a prima facie case of both retaliatory termination and pretext. Further, the evidence presents reasonable but competing inferences of both discrimination and nondiscrimination, thus summary judgment was improper. Hill, 144 Wash.2d at 186, 23 P.3d 440 (Once evidence supporting a prima facie case, a non-discriminatory explanation, and pretext has been presented and "the record contains reasonable but competing inferences of both discrimination and nondiscrimination, `it is the jury's task to choose between such inferences.'"), quoting Carle, 65 Wash.App. at 102, 827 P.2d 1070. Thus, we reverse and remand for trial of Estevez's retaliatory termination claim.
*593 ¶ 70 Because we reverse and remand for trial, the Faculty Club's claim that the trial court's award of deposition costs under RCW 4.84.010(7) was erroneously calculated is moot; that award is also reversed.
¶ 71 Affirmed in part, reversed in part, and remanded for trial on the retaliatory termination of employment claim.
WE CONCUR: APPELWICK and AGID, JJ.
NOTES
[1] Rohrbaugh declared that Layne engaged in an angry confrontation with another cook on September 24, 2001, and that this was "out of character for him." Rohrbaugh stated she discussed the matter with Fazzini and the UW Police. Layne again "acted out of character" on October 2, 2001, in responding to a Faculty Club member's request to prepare a salad in a certain way. Rohrbaugh stated she did not know what to make of Layne's behavior, but spoke with Ron Boerger from UW Human Resources and passed on his phone number to Layne.
[2] Layne was involuntarily taken to Harborview Medial Center in October 2001, after missing an appointment with a psychiatrist and getting into an altercation with police. He was thereafter diagnosed with bi-polar disorder.
[3] The Equal Employment Opportunity Commission (EEOC) Compliance Manual § 2-11(B)(4)(a)(ii) (http://www.eeoc .gov/policy/docs /threshold.html), cited by the Faculty Club, also cites both Quijano, 617 F.2d at 131 and Chicago Club, 86 F.3d at 1435 to help in defining the requirements for a "bona fide private membership club."
[4] Honorary memberships are open to the Board of Regents. Retired memberships are open to retired faculty and staff. Special memberships are open to "persons who have been recommended by Active members to the Board of Trustees and approved by at least five Trustees." Guest memberships are open to visiting faculty whose appointments are for not more than three consecutive quarters or "[o]ther professional personnel who are on campus for not more than three consecutive quarters for independent research or student, upon recommendation by Active members to the Board of Trustees and approval by at least five Trustees." Reciprocal membership is open to "members in good standing in Faculty Clubs at other institutions with which the University of Washington has a reciprocal agreement." Alumni memberships are open to dues payment members of the University of Washington Alumni Association with "conditions of membership, including dues, to be set by the Board of Trustees." Clerk's Papers at 13-14, Article III, § 1 a-g.